**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| JERRY JONES and MANUEL ACOSTA, On Behalf of Themselves And All Others Similarly Situated, | Civil Action No.: 4:08-cv-01991-HEA |
| Plaintiffs, | |
| vs. | |
| MEMC ELECTRONIC MATERIALS, INC., NABEEL GAREEB, AHMAD R. CHATILA, PETER BLACKMORE, MARSHALL TURNER, ROBERT J. BOEHLKE, JOHN MARREN, C. DOUGLAS MARSH, WILLIAM E. STEVENS, JAMES B. WILLIAMS, MICHAEL McNAMARA, THE PLAN INVESTMENT COMMITTEE, KENNETH H. HANNAH, MIGNON CABRERA, JAIRAJ CHETNANI, BRANDI WALLACE, JAMES WELSH, and JOHN DOES 1-10, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiffs Jerry Jones and Manuel Acosta ("Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by MEMC Electronic Materials, Inc. ("MEMC" or the "Company"), including the Company's proxy statements (Form 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of the MEMC Electronics Materials, Inc. 401(k) Savings Plan (the "Plan"); a review of the Forms 5500 filed by the Plan with the U.S. Department of Labor ("DOL"); interviews with participants of the Plan;

and a review of available documents governing the operations of the Plan.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      This is a class action brought on behalf of the Plan, pursuant to § 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2), against the fiduciaries of the Plan for violations of ERISA.

2.      The Plan is a retirement plan sponsored by MEMC.  MEMC Retirement Savings Plan (2002) Restatement ("Plan Document"), Article II, § 2.21 ("Sponsor means MEMC Electronic Materials, Inc.").

3.      Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the period June 13, 2008 through the present (the "Class Period").

4.      Defendants allowed the imprudent investment of the Plan's assets in MEMC common stock ("MEMC Stock" or "Company Stock") throughout the Class Period, even though they knew or should have known that such investment was unduly risky and imprudent.  The Company's serious mismanagement and improper business practices led to the artificial inflation of MEMC Stock.  As a result, MEMC Stock was an unduly risky and inappropriate investment option for Plan participants' retirement savings during the Class Period.

5.      In Count I, Plaintiffs allege that certain Defendants, each having specific responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plan and Plan participants by failing to prudently and loyally manage the

Plan's investment in Company securities by (a) continuing to offer MEMC Stock as a Plan investment option when it was imprudent to do so; (b) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in MEMC Stock; and (c) maintaining the Plan's pre-existing investment in MEMC Stock when Company stock was no longer a prudent investment for the Plan.

6.     In Count II, Plaintiffs allege that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering MEMC Stock as an investment option and investing Plan assets in MEMC Stock when it was no longer prudent to do so.

7.     In Count III, Plaintiffs allege that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with the best interests of the Plan and Plan participants solely in mind.

8.     In Count IV, Plaintiffs allege that Defendants breached their duties and responsibilities as co-fiduciaries by knowing of breaches of fiduciary duties and failing to remedy them, knowingly participated in the breaches of fiduciary duties, and/or enabling the breaches of fiduciary duties.

9.     As is more fully explained below, during the Class Period, Defendants (with responsibility for the Plan's investments) imprudently permitted the Plan to hold and acquire tens of millions of dollars in MEMC Stock despite the Company's serious mismanagement and improper business practices.  Based on publicly available information for the Plan, Defendants' breaches have caused a loss of millions of dollars of retirement savings.

3

10.     This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

11.     ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested in MEMC Stock during the Class Period.

12.     In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made by necessity on information and belief.  At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint or, if required, will seek leave to amend to add additional facts that further support Plaintiffs' claims.

## II.     JURISDICTION AND VENUE

13.     *Subject Matter Jurisdiction*.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

14.     *Personal Jurisdiction*.   ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the United States.  Therefore, this Court has personal jurisdiction

4

over them.  This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of Missouri.

15.     ***Venue***.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and MEMC has its principal place of business in this district.

### III.     PARTIES

#### A.     Plaintiffs

16.     Plaintiff Jerry Jones is a resident of Brazoria County in the State of Texas.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held MEMC Stock in the Plan during the Class Period.

17.     Plaintiff Manuel Acosta is a resident of St. Charles County in the State of Missouri.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held MEMC Stock in the Plan during the Class Period.

#### B.     Defendants

##### 1.     The Company

18.     ***Defendant MEMC*** is a Delaware corporation with its principal executive offices located at 501 Pearl Drive, St. Peters, Missouri.  MEMC designs, manufactures, and sells silicon wafers for the semiconductor industry worldwide.

19.     The Company is the Plan Sponsor.  Retirement Savings Plan Summary Plan Description (August 2004) (the "SPD") at 33.

20.     MEMC has the power to appoint the Plan Administrator to serve at its pleasure. Plan Document, Article XIII, § 13.4 ("the Sponsor [MEMC] shall appoint a Plan Administrator to serve at its pleasure").

21.     Pursuant to the Plan Document:

> The Sponsor [MEMC] may change such appointment from time to time provided that such changes are published to the extent of enabling interested parties to ascertain the persons or persons responsible for operating the Plan.   In absence of such an appointment, the Sponsor shall serve as the Plan Administrator; provided that if the Sponsor serves as the Plan Administrator, it shall designate specified individuals or other persons to carry out specified fiduciary responsibilities under the Plan in such a manner and to such an extent that Employees and other interested parties are able to ascertain the person or persons responsible for operating the Plan.

Plan Document, Article XIII, § 13.4.

22.     The Company also has the power to appoint the Plan Investment Committee (defined below).  Plan Document, Article XIII, § 13.5 ("The Sponsor [MEMC] shall appoint a Plan Investment Committee to serve at its pleasure").

23.     Pursuant to the Plan Document, Article XIII, § 13.5:

> The Sponsor may change such appointment from time to time provided that such changes are published to the extent of enabling interested parties to ascertain the person or persons responsible for operating the Plan.  In absence of such appointment, the Sponsor shall serve as the Plan Investment Committee; provided that if the Sponsor serves as the Plan Investment Committee, it shall designate specified individuals or other persons to carry out specified fiduciary responsibilities under the Plan in such a manner and to such an extent that Employees and other interested parties are able to ascertain the person or persons responsible for operating the Plan.   The Plan Administrator and the Plan Investment Committee may be the same person or persons.

24.     The Company reserves the right to change or terminate the Plan at any time and for any reason.   SPD at 29; Form 11-K, dated June 27, 2008 ("2008 Form 11-K") at 7 ("Although it has not expressed an intent to do so, the Company has the right under the Plan to

discontinue its contributions at any time and terminate the Plan subject to the provisions of ERISA"); Plan Document, Article XVI, §§ 16.1, 16.2.

      2.      **MEMC Director Defendants**

25.      *Defendant Nabeel Gareeb ("Gareeb")* was, at relevant times, the Company's Chief Executive Officer ("CEO") and a Director of the Company.  Defendant Gareeb resigned as President and CEO on November 12, 2008, but remained fully employed by the Company through December 31, 2008.  During the Class Period, Defendant Gareeb was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

26.      *Defendant Ahmad R. Chatila ("Chatila")* was, as of March 2, 2009 to the present, President, CEO and a Director of the Company.  During this time, Defendant Chatila was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

27.      *Defendant Peter Blackmore ("Blackmore")* was, at relevant times, a Director of the Company.  During the Class Period, Defendant Blackmore was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the

7

Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

28. ***Defendant Marshall Turner (“Turner”)*** was, at relevant times, a Director of the Company. During the Class Period, Defendant Turner was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

29. ***Defendant Robert J. Boehlke (“Boehkle”)*** was, at relevant times, a Director of the Company. During the Class Period, Defendant Boehkle was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

30. ***Defendant John Marren (“Marren”)*** was, at relevant times, the Chairman of the Board of the Company. During the Class Period, Defendant Marren was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

31.     *Defendant C. Douglas Marsh ("Marsh")* was, at relevant times, a Director of the Company.  During the Class Period, Defendant Marsh was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

32.     *Defendant William E. Stevens ("Stevens")* was, at relevant times, a Director of the Company.  During the Class Period, Defendant Stevens was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

33.     *Defendant James B. Williams ("Williams")* was, at relevant times, a Director of the Company.  During the Class Period, Defendant Williams was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

34.     *Defendant Michael McNamara ("McNamara")* was, at relevant times, a Director of the Company.  During the Class Period, Defendant McNamara was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of

the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

35.     Defendants Gareeb, Chatila, Blackmore, Turner, Boehkle, Marren, Marsh, Stevens, Williams and McNamara are herein referred to as the "Director Defendants."

36.     The Director Defendants are fiduciaries of the Plan as they have general responsibility for the investment of Plan assets.  Plan Document, Article XIII, § 13.6 ("The Plan Investment Committee shall have the general responsibility for the investment of Plan assets, ***as authorized by the Board of Directors of the Sponsor*** [MEMC]") (emphasis added).

**3.     The Investment Committee**

37.     ***Defendant Plan Investment Committee (the "Investment Committee")*** was, at all relevant times, a named fiduciary of the Plan.  Plan Document, Article XIII, § 13.6 ("The Plan Investment Committee shall have the general responsibility for the investment of Plan assets, as authorized by the Board of Directors of the Sponsor . . .").

38.     Pursuant to the Plan Document Article XIII, § 13.6, the Investment Committee was allocated the following power and authority:

- To establish investment policies;
- To appoint, monitor and remove a Trustee or Trustees;
- To appoint, monitor and remove Investment Managers, if any; and
- To select investment Funds in accordance with Article VIII.

39.     Further, pursuant to the Plan Document, Article XIII, § 13.7:

> If a Committee is serving as Plan Administrator or as the Plan Investment Committee, an action of the Committee shall be valid if concurred in (a) by a majority of the members then serving at a meeting of which all members receive reasonable advance notice, or (b) unanimous written consent in lieu of a meeting.  A member

may participate in a meeting by means of conference telephone or similar communications equipment.

A Committee may appoint one or more of its members to carry out any particular duty or duties or to execute any and all documents. Any documents so executed shall have the same effect as if executed by all such persons.  Such appointment shall be made by an instrument in writing that specifies which duties and powers are so allocated and to whom each such duty or power is so allocated.

40.     Further, the Plan Administrator and Plan Investment Committee "may delegate to any agents such duties and powers, both ministerial and discretionary, as the Plan Administrator or Plan Investment Committee deems appropriate, by an instrument in writing which specifies which duties are so delegated and to whom each such duty is so delegated." *Id.*

41.     The Investment Committee has the power and authority to select the Trustee(s). Plan Document, Article XIV, § 14.3.

42.     The Investment Committee has the power and authority to remove the Trustee(s). Pursuant to the Plan Document:

> The Plan Investment Committee may remove a Trustee by delivering to such Trustee a properly executed written instrument to that effect.  A Trustee may resign as Trustee upon giving written notice to the Plan Investment Committee.   Such removal or resignation shall become effective upon the date specified in such resolution or such written notice.  In the event of such removal or resignation, a successor Trustee shall be appointed by the Plan Investment Committee.  Such successor Trustee, upon accepting the appointment by an instrument in writing delivered to the Plan Investment Committee, shall become vested with all the rights, powers, duties, privileges and immunities as Trustee as if he, they or it had originally been designated as Trustee of this Trust.  Upon such appointment and acceptance, the replaced Trustee shall execute any instruments necessary to transfer to the successor Trustee all assets held under this Trust.

Plan Document, Article XIV, § 14.4.

43.     The Investment Committee has the power and authority to "deliver to the Trustee and each Investment Manager an investment policy that sets out the guidelines for the investment

of the assets over which the trustee or Investment Manager has discretionary control." Plan Document, Article XIV, § 14.5.

44.    Further, the Investment Committee "may add, change or eliminate investment alternatives at any time or from time to time." Plan Document, Article VIII, § 8.1.

45.    During the Class Period, the Investment Committee was comprised of the following Company employees:

(a)    ***Defendant Kenneth H. Hannah ("Hannah")*** was, at all relevant times, Senior Vice President and Chief Financial Officer. During the Class Period, Defendant Hannah was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets;

(b)    ***Defendant Mignon Cabrera ("Cabrera")*** was Senior Vice President of Human Resources of MEMC. As of May 6, 2009, Defendant Cabrera no longer serves as Senior Vice President, Human Resources for the Company. During the Class Period, Defendant Cabrera was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets;

(c)    ***Defendant Jairaj Chetnani ("Chetnani")*** was, at all relevant times, Treasurer. During the Class Period, Defendant Chetnani was a fiduciary within the meaning of ERISA because he possessed discretionary

12

authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets;

(d)    *Defendant Brandi Wallace ("Wallace")* was, at all relevant times, Manager of Benefits of the Company.  During the Class Period, Defendant Wallace was a fiduciary within the meaning of ERISA because she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets; and

(e)    *Defendant James Welsh ("Welsh")* was, at all relevant times, Manager of Benefits.  During the Class Period, Defendant Wallace was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

46.    Defendants Hannah, Cabrera, Chetnani, Wallace, and Welsh are herein referred to as the "Investment Committee Defendants."

47.    *Defendants John Does 1-10 ("John Does 1-10")* are residents of the United States and are or were fiduciaries of the Plan during the Class Period.  These defendants whose identities are currently unknown to Plaintiffs, may include additional MEMC employees.  Once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.

## IV.     THE PLAN

48.     The Plan, sponsored by MEMC, is a defined contribution plan.  The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

49.     The Plan is a voluntary contribution plan whereby participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to participants' individual accounts.

50.     Pursuant to the Company's 2008 Form 11-K, Plan participants can direct their accounts to be invested in MEMC Stock Fund, along with eleven (11) other funds offered by the Plan as investment options.  2008 Form 11-K at 4.

51.     The Company selects the investment assets in the Plan.  MEMC Retirement Plan Service Agreement ("Service Agreement") at 7.

52.     The Plan is a retirement plan.  Plan Document, Article I, § 1.4 ("This Plan is intended to provide a means whereby MEMC Electronic Materials, Inc. and participating Affiliates may encourage their eligible Employees to establish a regular method of savings and thereby create a fund available for their use at retirement or in the event of disability or death"); SPD at 1 ("The purpose of the plan is provide a means by which eligible employees can establish a regular method of savings and create a fund for their use at retirement or in the event of disability or death").

53.     In the Company's 2008 Form 11-K, the Plan is described as the following:

*General* – The Plan was established on April 1, 1989 under the provisions of Section 401(k) of the Internal Revenue Code and is a defined contribution retirement savings plan, subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), sponsored by the Company.  Generally, all employees of MEMC Electronic Materials, Inc. (the Company) compensated in U.S. dollars from a payroll location with the United States are eligible to participate in the Plan.

54.     Putnam Fiduciary Trust Company serves as the trustee of the Plan.  Putnam Fiduciary Trust Company Investment Funds for Pension and Profit Sharing Trusts – Declaration of Trust – Fifth Amendment and Restatement (Effective as of March 31, 2008) (the "Trust Agreement") at 1.

55.     Pursuant to the 2008 Form 11-K:

The Plan permits voluntary contributions from participants up to 100% of their compensation.  Such contributions are credited directly to the participants' accounts and are fully vested. Contributions may be allocated to the available investment options at the discretion of the participant.  Gains and losses under the Plan are valued on a daily basis and allocated to participant accounts based on account balances.

56.     MEMC employees may elect to contribute from 1% to 50% of his/her covered compensation as described in the Plan on a before-tax basis.  The before-tax contribution is limited to the amount specified by Section 402(g) of the Internal Revenue Code ($15,500 and $15,000 in 2007 and 2006, respectively).  A Plan participant is also eligible to receive employer matching contributions of 100% of the first 3% of the employee's contribution for the Plan year; 50% of the next 2% contributed, and 20% of the next 1% contributed, up to 4.2% of the participant's covered compensation for the Plan year.  2008 Form 11-K at 4; SPD at 2.

57.     As of December 31, 2007, the Plan held $33,326,853 of MEMC's Stock.  2008 Form 11-K at 8.

58.     The Plan documents do not mandate that MEMC Stock be offered in the Plan. Pursuant to the Trust Agreement, "[n]otwithstanding the investment Characteristic of a Fund, the

assets of *any* Fund may be invested in obligations of the United States Government, commercial paper, certificates of deposits, money market deposit accounts, money market mutual funds, savings accounts and/or short-term investments . . . ."  Trust Agreement, Article III, Section 2(d) (emphasis added).

59.     The Plan incorporates by reference the Company's SEC filings.  For example, the Company's SPD states in relevant part:

> This Summary Plan Description does not contain all of the information set forth in the Registration Statement filed with the Securities Exchange Commission with respect to the MEMC common stock offered under the MEMC Stock Fund investment alternative.  However, the documents incorporated by reference in the Registration Statement are also incorporated by this reference into the Summary Plan Description.  When necessary, MEMC will update the information in this Summary Plan Description and provide you with a copy of the updated information.

> If you direct any portion of your RSP money into MEMC Stock Fund, you will be given all future materials, including reports to stockholders, other reports, proxy statements, and other communications generally given to MEMC stockholders.

SPD at 34.

60.     In addition, the Company's Form S-8, dated Jan. 2, 1997, incorporates the Company's SEC filings and all subsequently filed Company documents (*i.e.*, Form  10-Ks, Form 10-Qs, Form 8-Ks, and Form 11-Ks) with the SEC.

**A.      The Plan Incurred Significant Losses during the Class Period**

61.     During the Class Period, a significant amount of the Plan's assets were invested in MEMC Stock.  As of December 31, 2007, the Plan held approximately $33,326,853 in Company Stock.  2008 Form 11-K at 2.  Following revelations that Defendants misrepresented or failed to disclose that:  (a) the Company had experienced material disruptions in its Texas and Italy facilities; (b) such disruptions had prevented the Company, to a material extent, from generating expected revenues; (c) the Company operated its productive facilities on a run-to-failure basis;

and (d) that, as a result of the foregoing, the Company's previously issued guidance became lacking in any reasonable basis and required immediate revision, the price of MEMC Stock decreased dramatically.

62.     On July 23, 2008, MEMC shocked investors (which included Plan participants) when it disclosed, for the first time, that in June 2008 there was a failure of a heat-exchanger at the Company's Merano, Italy facility that reduced the Company's second quarter polysilicon output by almost five percent.  Additionally, on that same date, MEMC stated that a loose pipe fitting caused a fire on June 13, 2008 at the Company's Pasadena, Texas facility, which resulted in a shutdown of half the silane production in that facility for approximately a week.  This was the first revelation that the Company had suffered these significant problems at its production facilities.  These problems caused MEMC's second quarter net sales to be over $8 million less than the bottom range of the financial guidance that the Company issued in April 2008.

63.     As a result of this news, MEMC's shares fell $11.57 per share, or 21.51%, from July 23, 2008 to close on July 24, 2008 at $42.23 per share, on unusually heavy trading volume. As a result, the Plan incurred substantial losses due to its investment in MEMC Stock.

64.     Despite the Plan's substantial investment in MEMC Stock, Defendants failed to protect the Plan from the risks that resulted from the Company's reckless and improper conduct. Defendants continued to hold the Plan's shares of MEMC Stock and compounded the problem (and the losses) by purchasing additional shares during the Class Period.  Plaintiffs estimate a principal loss of millions of dollars.

## V.      DEFENDANTS' FIDUCIARY STATUS

### A.     The Nature of Fiduciary Status

65.     *Named Fiduciaries*. ERISA requires every plan to have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

66.     *De Facto Fiduciaries*. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions. *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

67.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants in the manner and to the extent set forth in the Plan's documents, under ERISA, and through their conduct.

68.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

69.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and the claims against each Defendant are based on such specific discretion and authority.

70.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, MEMC chose to delegate its responsibility regarding the administration of the Plan to the Investment Committee.  Plan Document, Article XIII, §§ 13.4, 13.5.  MEMC chose to assign the appointment and removal of fiduciaries to itself (*id.*), which, in turn, selected the members of the Investment Committee.  *Id.*

71.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions.  ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3).  However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

## 1.     The Company's Fiduciary Status

72.     On information and belief, in order to comply with ERISA, the Company exercised responsibility through the Investment Committee for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA.  *See, e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).  In

this regard, the Company and the Investment Committee disseminated the Plan's documents and related materials, which incorporated by reference, among other things, MEMC's inaccurate SEC filings, thus converting such materials into fiduciary communications.

73.     The Company is also charged with the appointment, monitoring, and removal of the Investment Committee.  Plan Document, Article XIII, § 13.4

74.     Moreover, on information and belief, MEMC exercised control over the activities of its employees who performed fiduciary functions with respect to the Plan, including the Investment Committee.  MEMC, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Thus, MEMC is responsible for the activities of its employees as fiduciaries with respect to the Plan through traditional principles of agency and *respondeat superior* liability.

75.     Finally, under basic tenets of corporate law, MEMC is imputed with the knowledge its officers and employees (which include the other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to MEMC.

76.     Consequently, in light of the foregoing duties, responsibilities, and actions, MEMC was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because it exercised discretionary authority or discretionary control over the management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plan.

2.      **The Director Defendants Fiduciary Status**

77.     Pursuant to the Plan Document, "the Plan Investment Committee shall have the general responsibility for the investment of Plan assets, ***as authorized by the Board of Directors of the Sponsor***."  Plan Document, Article XIII, § 13.6 (emphasis added).

78.     Consequently, in light of the foregoing duties and responsibilities, the Director Defendants (Defendants Gareeb, Chatila, Blackmore, Turner, Boehkle, Marren, Marsh, Stevens, Williams and McNamara) were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised discretionary authority or discretionary control over the management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plan.

3.      **The Investment Committee Defendants Fiduciary Status**

79.     During the Class Period, the Company relied on the Investment Committee Defendants to carry out its fiduciary responsibilities under the Plan and ERISA.  As a result, the Investment Committee Defendants are both named and functional fiduciaries under ERISA. Plan Document, Article XIII, §§ 13.6, 13.7 and Article XIV, §§ 14.4, 14.5.

80.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Investment Committee Defendants (Hannah, Cabrera, Chetnani, Wallace, and Welsh) are named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised discretionary authority or discretionary control over the management of the Plan, exercised authority or control over the management or disposition of

the Plan's assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plan.

## VI.    FACTS BEARING ON FIDUCIARY BREACH

**A.    MEMC Stock Was An Imprudent Investment For The Plan During The Class Period Because Of The Company's Mismanagement And Exposure To Material Disruptions At Its Facilities**

81.    During the Class Period, MEMC Stock became an imprudent investment for participants' in the Plan because (a) the Company had experienced material disruptions in its Texas and Italy facilities; (b) such disruptions had prevented the Company, to a material extent, from generating expected revenues; (c) the Company operated its productive facilities on a run-to-failure basis (but failed to disclose this information); and (d) as a result of the foregoing, the Company's previously issued guidance became lacking in any reasonable basis and required immediate revision.  This created financial circumstances that exposed the Plan to the risk of substantial losses.

82.    While a fiduciary's duty of prudence does not include a general duty to diversify with respect to company stock, in an ERISA-governed retirement plan, the duty does require fiduciaries to act prudently, loyally, and with the exclusive purpose of providing benefits to plan participants and beneficiaries.  As such, a fiduciary may not ignore circumstances, such as those here, that increase the risk of loss to participants and beneficiaries to an imprudent and unacceptable level.

83.    MEMC's inaccurate statements increased the risk of loss by contributing to the artificial inflation of the value of Company Stock.  As the DOL, the agency charged with responsibility for enforcing ERISA, has stated, it is never prudent for a retirement plan fiduciary to purchase company stock that he knows or should know is artificially inflated.  Brief of the

Secretary of Labor as Amicus Curie Supporting Appellants and Requesting Reversal at 15-16, *In re Calpine Corp. ERISA Litig.*, No. 06-15013 (9th Cir. Nov. 15, 2006).

**B.**     **Background**

84.     MEMC is a manufacturer and seller of polysilicon wafers and related intermediate products to the semiconductor and solar industries.

85.     According to MEMC's website (http://www.memc.com), the Merano, Italy facility manufactures single crystal ingots and polysilicon.  The MEMC Pasadena, Texas facility produces semiconductor-grade granular polysilicon, monosilane and SiF4 gases and semiconductor-grade silicon powder.  The ultra-pure granular polysilicon manufactured at the MEMC Pasadena facility is the base material for manufacturing of silicon wafers.

86.     Since 1995, MEMC Pasadena facility has expanded from the original capacity of approximately 1,100 metric tons of semiconductor-grade polysilicon per year to an estimated 4,400 metric tons per year.  Upon information and belief, a proposed, additional expansion will increase production capacity to approximately 5,000 metric tons of semiconductor-grade polysilicon per year.  According to an article published on April 3, 2008 in *Semiconductor International* entitled "MEMC Fixing Buildup Issues at Texas Polysilicon Facility," the Pasadena facility accounts for two-thirds of MEMC's total polysilicon capacity.

87.     Polysilicon has several commercial applications, including silicon wafers and solar panels.  Refined polysilicon – the semiconductor substrate used for integrated circuits – is a component part of semiconductor-grade silicon wafers.  Polysilicon manufacturing technology is highly technical and while some aspects are patented, companies maintain proprietary manufacturing processes and seek to keep the details of their methods of manufacturing known only to themselves.

88.     MEMC manufactures a number of high-grade silicon products, including the Optia$^{TM}$ and Aegis$^{TM}$ silicon wafers, for use in advanced device technologies, as well as component parts.  The wafers such as those manufactured and produced by MEMC are the foundation upon which virtually all of the world's semiconductors are built.  Those products are the building blocks for the $1 trillion electronic market (*i.e.*, cell phones, computers, PDSs, CD/DVD players, satellite and automotive electronics, etc.).

89.     The demand for semiconductor-grade polysilicon has increased at a rapid rate from 1995 to the present.  This upward trend is expected to continue as the worldwide demand for polysilicon continues to grow, along with the advancement of the computer and electronics industries, and technology dependent on silicon wafers and demand for photovoltaic panels.

C.     **Information Prior To The Class Period**

90.      Prior to the Class Period, MEMC's financial results had been negatively impacted by production problems at its Pasadena, Texas facility that materially impacted the Company's financial results for the periods ended September 30, 2007, December 31, 2007 and March 31, 2008.  According to an article published on *Seeking Alpha* on September 5, 2007, entitled "MEMC Cuts Q3 Guidance Due To Pasadena Construction Accident," the Pasadena, Texas facility accounts for 70% of MEMC's total production.

91.     On September 4, 2007, the Company issued a press release entitled "MEMC Provides Updated Third Quarter Guidance."  This press release discussed a construction accident at the Company's Pasadena, Texas facility that caused it to lower its third quarter 2007 guidance by approximately 5%.  This press release was filed with the SEC and was incorporated into Plan documents.  It was therefore a fiduciary communication to Plan participants.

92.     On October 5, 2007, the Company issued a press release entitled "MEMC Reports Third Quarter Results."  It was in this press release the Company reported results of operations for the quarter ended September 30, 2007, which included the previously disclosed construction accident:  "The impact associated with the ***previously disclosed construction incident*** at the company's Pasadena polysilicon manufacturing facility was the primary factor contributing to the sequential reduction in gross margin."  (emphasis added).

93.     It was in this same October 5, 2007 press release that Defendant Gareeb stated that "the extended effects of the [construction] incident caused [the Company] to lose well over a week's worth of production, miss our cost projections by the double digit millions, and delay our expansion."

94.     As stated in a news article in *IndustryWeek*, dated October 11, 2007, "such unplanned power disruptions at technologically sophisticated plants like MEMC's mean a long startup and recalibration process both the short-and long-term repercussions were severe."

95.     On October 25, 2007, the Company held an earnings conference call to discuss its the third quarter 2007 results.  It was at this earnings conference call that Defendant Gareeb further discussed the construction incident, stating in relevant part:  "To give an update on Pasadena, as you know, a construction incident caused by electrical subcontractor resulted in a power outage to our Pasadena polysilicon manufacturing facility.  […]  We have recovered from this discrete event to a steady state rate of production and are pleased to indicate that we are targeting to achieve the level of Q4 revenue targeted prior to the construction incident and be able to recover some of the lost revenue from Q3."

96.     On January 24, 2008, the Company issued a press release entitled "MEMC Announces Fourth Quarter & Full Year Results."  It was in this press release that the Company

issued results of operations for the quarter and year ended December 31, 2007.  Defendant

Gareeb also stated in relevant part:

> Based on customer input, we are targeting first quarter 2008 sales to be approximately $560 million. In addition, we are targeting margins to be approximately flat to slightly up compared to the exceptional fourth quarter.  Operating expenses are targeted to be approximately $42 million as a result of the timing of stock compensation expenses within 2008.

97.     On that same day, the Company also held an earnings conference call to discuss

its fourth quarter 2007 results.  The Company also discussed at this conference call its production

problems at the Texas facility:

> **Gordon Johnson** - Lehman Brothers:  Okay.  And then lastly, I guess on the revenue line, a bit softer than expected this quarter. Can you talk a little bit about kind of what drove that?
>
> **Gareeb**: Yes. On the revenue in Q4, really what the issue with the revenue shortfall from our target as kind of alluded to in statement was that *we ended up needing to do maintenance on some pieces of poly equipment in our Pasadena, Texas facility in December, in the last week really of December rather than in January as we had originally anticipated*.  And you can try to predict these things, but you can't, it's not very scientific.  And our expansion that was coming online was really planned to offset that maintenance activity in January, not in December.  So instead of growing by 15% sequentially, we grew by 13%, and margins you saw what happened up well over 400 bases points.  And so really, it was about a 1 day's impact, even though we did the some of that maintenance in the fourth week.
>
> *        *        *
>
> **Tim Luke** - Lehman Brothers:  Thanks Nabeel, couple of quick questions.  Just if you can comment what are the milestones going forward now on your payment schedule and I was just wondering if you could clarify again in terms of the one day disruption that you saw that impact the fourth quarter revenue.  Can you just clarify what that was again?  Thanks.
>
> **Gareeb**:  So the fourth quarter piece Tim, the net affect was basically one days worth of production that you saw in that approximately $5 million off the target that we had articulated it wasn't the . . . .

> **Tim Luke** - Lehman Brothers:  When did that come . . . when did you get that disruption?
>
> **Gareeb**:  *Right, so it wasn't a lets call it a disruption, call it early maintenance really.  We had anticipated that semi-annual maintenance would be occurring in the January, February time table and basically because of the shut down in September some of those pieces of equipment weren't running at a 100% operational efficiency.*  And so you can't really predict this plus, minus in a couple in a weeks and we thought it would happen January, February we had to basically take them down in the 4th late 3rd week, early 4th week of December and do some maintenance on them.  *And so that really cause[d] the shortage of poly which ripples through the entire pipeline.  That's obviously behind us and we did some maintenance on that in December, we did some maintenance on that this week and we'll do some again in probably late this quarter and so the expansion will offset those maintenance activities in this quarter*.

 (Emphasis added).

98.     Defendant Hannah also discussed on this conference call the problem at its Texas facility that caused the Company to miss its revenue target by about $5 million.  Defendant Hannah stated in relevant part that ". . . we missed our revenue target by less than one days worth of production due to earlier than planned maintenance activity required on our polysilicon equipment in Texas."

99.     On April 3, 2008, the Company issued a press release entitled "MEMC Provides First Quarter Update," announcing the results of the Company's operations for the quarter ended March 31, 2008.  In discussing the reasons behind the guidance, the Company stated in relevant part:

> The company reported that during the first quarter it experienced accelerated buildup of chemical deposits inside the new expansion unit ("Unit 3") at its Pasadena, Texas facility.  *These buildups occurred multiple times, and each instance required downtime of several days for premature maintenance to clean and re-stabilize the unit.*  The company also delayed the remaining maintenance (from the prior quarter) on the existing units ("Unit 1" and "Unit 2") waiting for Unit 3 to stabilize, but eventually had to perform the maintenance on Unit 2.  *The combination of these items*

> *caused the utilization of the Pasadena facility to be approximately 20% lower than the fourth quarter, resulted in much lower than anticipated output, and caused the company to not achieve the financial targets for the first quarter as disclosed on January 24, 2008.*

(Emphasis added).

100.    Shortly thereafter, on April 24, 2008, the Company issued another press release entitled "MEMC Reports First Quarter Results," announcing the results of operations for the quarter ended March 31, 2008.  It was in this press release that Defendants Gareeb stated in relevant part:

> Regarding our production and maintenance efforts in Pasadena, *our new unit (Unit 3) has demonstrated good results, and the announced maintenance activities on our pre-existing unit (Unit 1) have been completed*.
>
> Demand indications from semiconductor application customers are a bit weaker than typical, resulting in additional price declines from first quarter levels. Demand from solar application customers, however, continues to be strong.  *Although we are pleased with the results of the actions we have taken to address the issues that caused the lower than targeted polysilicon volume in the first quarter, given the unplanned issues that were encountered with our expected polysilicon ramp in the first quarter, we feel it is prudent to be extra cautious regarding our polysilicon output expectations in the second quarter.  As a result, we are targeting revenues of approximately $540 to $570 million for the second quarter*.   In addition, we are targeting gross margin of approximately 54%-55%, with operating expenses of less than $40 million.
>
> Regarding our polysilicon expansion, *we are currently targeting to achieve mechanical completion of Unit 4 (silane unit) in our Pasadena facility before the end of the second quarter*, as well as additional polysilicon reactor capacity in the third quarter.  This combination will mark the mechanical completion of our 8,000 metric tons of capacity which was originally targeted for the end of 2008.  Depending on the output ramp of the different units, this improved installation schedule may allow us to make good progress toward achieving our annual financial targets in the second half of 2008.

(Emphasis added).

101.    Defendant Gareeb's discussion regarding production matters at the Texas facility clearly demonstrates that each day of production was extremely important in order to meet the Company's production goals.  In fact, during a Company conference call for the first quarter 2008, Defendant Gareeb stated in relevant part that "Unit 1, as we had said, was down for maintenance.  Obviously that maintenance is now complete.  That maintenance took a few days longer because we had run it to failure and so it took a little bit longer to clean up."

102.    It was also in the first quarter 2008 conference call that Defendant Gareeb provided investors (which included Plan participants) with an update on the Texas facility:

> To give you an update on Pasadena, as you know, accelerated chemical deposits experienced inside our expansion unit, Unit 3, resulted in reduced output for the quarter.  On our update call earlier this month, we reported that Unit 3 was ramping, but Unit 2 was running with good output and that Unit 1 was undergoing maintenance.  ***Since then, maintenance on Unit 1 has been completed and Unit 3 has demonstrated good results.  While we are encouraged by the progress and are trying to be more cautious than normal, we are still providing second quarter targets that would result in strong sequential growth in revenue and margins***.

> In the near term, I remain encouraged by our progress on our polysilicon expansion.  ***We are currently targeting to achieve mechanical completion of our Unit 4 silane unit before the end of the current quarter, as well as additional polysilicon reactor capacity in the third quarter.  This combination will mark the mechanical completion of our targeted 8,000 metric tons of polysilicon capacity, which was originally targeted for the end of 2008***.

(Emphasis added).

103.    On April 24, 2008, the Company also issued a press release entitled "MEMC Provides Status Update After Raw Material Release" reporting that a transfer line developed a leak and caused a release of raw material gas.  The press release stated in relevant part: "At this stage, the company anticipates that production will resume on Friday, April 25, 2008 and does

not anticipate any impact to the financial targets provided earlier today as a result of this incident."

104.    Investors (including Plan participants) were kept current of the status of the impact of this event as the Company issued a second release on April 29, 2008, confirming that production at its Pasadena facility did, in fact, resume on April 25, 2008 and all three of the facility's silane units were operational.

105.    Indeed, the Company had set a precedent for promptly informing investors (and Plan participants) of adverse potential impact on production and confirming that the prompt resumption of production after such an event.  Further, for example, in the third and fourth quarters of 2007 and the first quarter of 2008, the Company provided two timely updates on previously issued guidance when an event possibly affecting production, and thus that guidance, had taken place and issued two additional press releases regarding events even when the Company did not believe there would be an impact on production.  Having established this precedent, the Company created an expectation that it would, and thus had a duty to, promptly disclose events that might impact production that the Company had reason to believe would be of importance to investors (which included Plan participants).

106.    Given its past production problems and the adverse impact such problems had on the Company's financial condition, Defendants were well aware that investors (including Plan participants) would find any production problems to be highly material.  In fact, during the first quarter 2008 press release, Defendants stated that "we feel it is prudent to be extra cautious regarding our polysilicon output expectations." Because Defendants were being "prudent," investors (including Plan participants) were left to believe that in the event anything occurred

that might knowingly (to Defendants) reduce revenue indicated in their previous guidance, the Company would promptly disclose such information.

107.    Indeed, on June 5, 2008, the Company met with analysts from Deutsche Bank and, after the meeting, on June 6, 2008, Deutsche Bank issued a report stating in part, that "[w]e hosted MEMC Electronics management in San Francisco yesterday, and while the company offered no new or incremental guidance, we are increasingly convinced that recent production issues are largely resolved, that silicon pricing remains very strong, and that semiconductor industry pricing weakness will likely be compensated for by solar PV business strength.  We maintain our Buy rating."

**D.    Defendants' Inaccurate Statements To Plan Participants**

108.    On June 13, 2008, a fire erupted at the Company's Pasadena facility (brought on by a loose pipe fitting) and as a result caused the Company's silane production to be shut down.  MEMC did not disclose the event.  Also in June 2008, a heat-exchanger at MEMC's Merano, Italy facility failed, causing an interruption in the Company's polysilicon output at that plant.

109.    Given MEMC's past production issues and the precedent it set by promptly informing investors (including Plan participants) of any events that would potentially impact production, at the beginning of the Class Period, Defendants should have informed Plan participants (and the investing community) about the problems at MEMC's Pasadena, Texas and Merano, Italy facilities, but failed to do so.

110.    Rather than remaining silent regarding the occurrences at its two facilities, MEMC had a duty to disclose:  (a) that the Company had experienced material disruptions at its two facilities; (b) that such disruptions would prevent the Company, to a material extent, from generating expected revenues and reach its previously issued guidance; and (c) that, as a result of

the foregoing, the Company's previously issued guidance became lacking in any reasonable basis and required immediate revision.

111.    The fire caused the Company's silane production at the Texas facility to be shut down for a week.  In short, there was a strong possibility that such an interruption in production would have an adverse impact on earnings and would cause the Company's previously published financial projections to be inaccurate.  Similarly, the failure of the heat exchanger in the Merano, Italy plant caused an interruption in the Company's production of polysilicon.  There was also a strong possibility that such an interruption in production would have an adverse impact on earnings and would cause the Company's previously published financial projections to be inaccurate.

112.    Indeed, during the June 23, 2008 earnings call, discussed below, Defendant Gareeb admitted that the Company knew that the previously issued guidance lacked any reasonable basis.  Defendant Gareeb stated in relevant part: "And so we didn't take that as a pre announcement in terms of doing it earlier in this quarter if you will, primarily because we didn't think 2% outside the bottom end of the range was material if you will."  The production issues at the Company's Italian facility and the Pasadena facility combined, Defendants knew, yet failed to timely disclose, would materially adversely impact the Company's financial results for the period ended June 30, 2008.

**E.      Defendants Finally Reveal The Truth**

113.    On July 23, 2008, after the close of the market, MEMC filed a Form 8-K with the SEC, disclosing (for the first time) that its financial results were below the bottom end of its targeted range as it encountered unanticipated events towards the tail end of the quarter.  The Company attributed the miss to:  "The premature failure of a relatively new heat-exchanger at

the company's Merano, Italy facility in June [which] reduced the company's second quarter polysilicon output by just under five percent."

114.    The Form 8-K also disclosed "a loose pipe fitting [which] caused a fire at the company's Pasadena facility that required a shut down of half the silane production . . . for approximately a week."

115.    It was in this same press release that Defendant Gareeb stated in relevant part:

> MEMC grew sales by 6% sequentially, expanded gross and operating margins by 150 and 200 basis points, respectively, continued to generate industry-leading levels of free cash flow at 22% of sales, and further expanded our cash and investment balances to approximately $1.5 billion.  ***However, our financial results were a bit below the bottom end of our targeted range as the company encountered unanticipated events towards the tail end of the quarter***.
>
> The premature failure of a relatively new heat-exchanger at the company's Merano, Italy facility in June reduced the company's second quarter polysilicon output by just under five percent. The output from the company's Pasadena, Texas facility during the month of May and early part of June (shown on the attached silane and polysilicon output charts) had positioned the company on a trajectory to exceed the upper end of the company's targeted second quarter revenue range.  Unfortunately, a loose pipe fitting caused a fire at the company's Pasadena facility that required a shut down of half the silane production commencing on Friday June 13.  Even though the complications lasted for approximately a week, the Pasadena facility recovered and managed to produce enough silane and polysilicon during the remainder of the quarter to be in the middle of that facility's targeted range for second quarter production, but there was not enough Pasadena production to completely offset the Merano shortfall.
>
> ***While we are disappointed that we experienced an uncharacteristic event at our Merano facility, we are pleased that we were able to limit the impact to a few percent below the targeted revenue rang***e. This was primarily a result of the accomplishments in the second quarter that helped to offset the Merano shortfall.  Specifically, we:
>
> --     Achieved strong output from Unit 3 in Pasadena, overcoming most of the issues that held us back in the first quarter.

> While *output was limited by the fire incident and its associated complications, the unit has recovered well*.
>
> --     Completed and ramped Unit 4 in Pasadena over a month prior to the end of the quarter, *with the unit running at good rates save for the interruption of the fire incident*.

(Emphasis added).

116.    Also, on July 23, 2008, the Company held a conference call to discuss the second quarter 2008 financial results.  It was at this conference call that Defendant Gareeb provided an overview of why the Company's financial results were below the low end of the range. Defendant Gareeb stated in relevant part:

> So let's start with a summary of what caused us to miss our targeted range of results.  *The premature failure of the heat exchanger that was relatively new at our Merano facility in June, reduced the company's total second quarter polysilicon output by just under 5% for the quarter.  While Pasadena had been running enough ahead of schedule to offset the Merano shortfall, complications there from a loose pipefitting and resulting fire caused us to shut down half the silane production on June 13th*.
>
> And while the facility recovered from this fairly quickly and manage to produce enough silane and polysilicon to be in the middle of its targeted range for production, *Pasadena could not produce enough product fast enough to offset the Merano shortfall and allow us to finish the quarter within our targeted band of revenue.*
>
> *I am disappointed that we were not able to avoid additional unexpected events in Q2 or result the complications Merano faster or produce more polysilicon in Pasadena to offset all the Merano shortfalls.*  However, what I am pleased and excited about is the following:  First, in Pasadena, *Unit 3 overcame the issues that held us back in Q1 although with some limitations due to the fire, but has recovered well.  Second, Unit 4 was started up over a month prior to the end of the quarter and has ramped and run at good rates other than interruption of the fire.*
>
> *Third, the combined output from Units 3 and 4 during May and early June alone had positioned us on a trajectory to finish the quarter ahead of the upper end of our targeted revenue range* and the strong output allowed us to offset a portion of the Merano shortfall in the last week of June.

Fourth, we have completed this technically and operationally challenging phase of silane expansion in Pasadena, and now have a high level of confidence in the longer-term performance of Units 3 and 4.  We expect this should eliminate silane production as a constraining element.  Fifth, we have mechanically completed the two additional poly-reactors in Pasadena, where the ramp is scheduled to begin next week.  As a result of these installations, we are now at 75 to 100 metric tons of annualized poly capacity, have a number of […] record number rectors available to produce poly, and have demonstrated good output in July.

Last, but not least, we have replaced the heat exchanger on Merano, started the expansion and are on track to finish the expansion and phases in August 1st, and September 1st, which will get us to the 8,000 metric tons of annualized capacity before the end of the third quarter.  So, I would like to put all these events in perspective. ***Although we have had a difficult first half of this year, with ramps and unexpected events and discoveries, we have achieved numerous milestones and demonstrated capability for extended periods of time that have positioned us for significant growth in the second half of this year versus the first half.***  This is what we had hoped to accomplish when we last talked in our April call.

(Emphasis added).

117.    Further, it was during this same earnings call that an analyst from Oppenheimer questioned Defendant Gareeb about his failure to timely disclose these incidents as the Company has done in the past:

> **Sam Dubinsky – Oppenheimer**:  Hey guys couple of quick questions. It seems just do the size estimate, just surprising that you guys can do a preannouncement.  ***I am just wondering what the reasoning was for not doing a pre announce this time as you served down on in the past with sort of these ramp up issues and then I have a couple of follow up questions***.

> **Gareeb**:  Sure, basically when we had the Merano issue, we thought that pretty comfortable that with that with the strength of the silane […] the poly production Pasadena as you can see from the charts through the month of May and early June. They are really up for the fire in Pasadena. We felt okay may be we won't be at the top end of the range, but we should be in the range. And basically we ended about 2% outside the range, which is about a couple of days' worth of production.  ***And so we didn't take that as a pre announcement in terms of doing it earlier in***

> *this quarter if you will, primarily because we didn't think 2% outside the bottom end of the range was material if you will.*
>
> *But also we wanted to provide a second half up date that we would not have been ready to provide.  And we also wanted to have the demonstrated recovery both from the fire as well as the replacement of the equipment in Merano to ensure that we had a pretty solid set of numbers in our head for Q3 and for the second half of the year.*

(Emphasis added).

118.    In fact, other analysts were also shocked the Company did not pre-announce this material information.  In a report dated July 23, 2008, a Deutsche Bank analyst expressed surprise at the Company's disclosure: "This is the third miss in four quarter . . . *we were surprised the company did not pre-announce these results*." (emphasis added).

119.    Further, on July 24, 2008, an analyst from Credit Suisse stated in relevant part: "This was the first instance company had to deliver on a complex factory build – and for the third time company slipped on execution. ***Company did not preannounce [] either compounding issues – making it "Strike 3" for several investors we spoke with*** . . ." (emphasis added).

120.    The July 23, 2008 disclosure caused the price of the Company's stock to drop from $53.80 to $42.23 in unusually heavy trading.   As demonstrated from the chart below, MEMC Stock has still not recovered:



**F.**   **Defendants Suffered from Conflicts of Interest**

121.    As ERISA fiduciaries, Defendants were required to manage the Plan's investments, including the investment in MEMC Stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.   This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

122.    Conflicts of interest arise when a company that invests plan assets in company stock founders.   As the situation deteriorates, plan fiduciaries are torn between their duties as

officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear, "[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions." *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir.1992) (citation omitted).  Fiduciaries must avoid "placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan."  *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

123.    MEMC's SEC filings, including proxy statements, during the Class Period make clear that a significant percentage of the Company's officers and directors' compensation is stock-based.  MEMC Definitive Proxy Statement, Form 14A, dated March 10, 2009 ("2009 Form 14A").

124.    For example, the following stock awards, fees and options allocated to Director Defendants:  (i) Defendant Blackmore, $363,051; (ii) Defendant Boehlke, $207,239; (iii) Defendant Marren, $219,239; (iv) Defendant Marsh, $196,239; (v) Defendant McNamara, $158,603; (vi) Defendant Stevens, $368,937; (vii) Defendant Turner, $232,471; and (viii) Defendant Williams, $194,239.   2009 Form 14A at 12.

125.    Defendant Gareeb also received option awards for 2008 and 2007 in the amount of $4,831,721 and $12,455,747, respectively.  *Id.* at 23.  Further, Defendant Gareeb's 2008 short term incentive award was determined as follows.  For 2008, as part of his Employment Agreement, the Compensation Committee established a target bonus level of 100% of Defendant Gareeb's annual base salary and a maximum bonus level of 200% of his annual base salary. Defendant Gareeb's target award was based on the Company's overall financial performance (including operating income and earnings per share), and the Company's achievement of certain

strategic initiatives and objectives (including executive team development, certain capacity expansion and product launches, solar business development, key account penetration and market share, customer satisfaction and research and development).

126.    Further, under the heading "Long Term Incentive Awards (Equity Awards)," the 2008 Form 14A provides that executive compensation is based in part on the Company's earnings.

127.    Certain Defendants' compensation was directly tied to the performance of the Company and the price of MEMC's Stock.  Accordingly, certain Defendants were motivated to inflate the perceived success of the Company and boost its apparent performance, because the better the Company's performance and, consequently, the higher the price of the Company's Stock, the larger certain Defendants' salaries and incentive compensation.

128.    Some Defendants may have had no choice in tying their compensation to MEMC Stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan's participants' and beneficiaries' retirement savings invested in MEMC Stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

129.    Finally, any signal to the market that the Company was not a sound, long term investment, such as the Plan's divestiture of MEMC Stock, would have called into question Defendants' job performance as corporate officers.  Rather than have anyone question their soundness as leaders of MEMC, Defendants chose to remain silent and let the Plan continue to hold and acquire MEMC Stock.

130.    These conflicts of interest put Defendants in the position of having to choose between their own interests as directors, executives, and stockholders, and the interests of the

Plan's participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

131.   Defendants did nothing to protect the Plan and the Plan's participants from the inevitable losses the Plan would suffer.

132.   While the above Defendants protected themselves, they stood idly by as the Plan lost millions of dollars because of its investment in MEMC Stock.

## VII.   THE RELEVANT LAW

133.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a plan participant for relief under ERISA § 409, 29 U.S.C. § 1109.

134.   An individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a fiduciary.  *See* U.S.C. § 1002(21)(A); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *Concha v. London*, 62 F.3d 1493 (9th Cir. 1995).

135.   When fiduciaries put the interests of the company or their own interests ahead of the interests of plan participants, they violate ERISA.  A fiduciary may, therefore, be personally liable to plan participants for breaching the responsibilities, obligations, or duties imposed under the plan and must restore any losses to the plan with any profits the fiduciary made through use of plan assets.  ERISA § 409(a), 29 U.S.C. § 1109(a).

136.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from fiduciaries, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

137.   ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part:

> A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

138.  These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

139.  A fiduciary breaches the duty of loyalty when the fiduciary withholds information that the fiduciary knows or should know a participant would need to make an informed decision. Therefore, the duty of loyalty includes:  (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

140.  A fiduciary must avoid conflicts of interest and resolve them promptly when they do occur.  As such, a plan fiduciary must always administer a plan with an exclusive purpose or "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  *Bierwirth*, 680 F.2d at 271.

141.  A plan fiduciary is also responsible for the investment and monitoring of plan investments, ensuring that only prudent investments are offered as plan options, and monitoring such investments to ensure that they remain prudent and suitable for the plan. *In re ADC Telecomm, ERISA Litig.*, No. 03-2989, 2004 U.S. Dist. LEXIS 14383 (D. Minn. July 26, 2004). This includes the duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan.

142.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co- Fiduciary,"

provides, in pertinent part:

> In addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be
> liable for a breach of fiduciary responsibility of another fiduciary
> with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary,
> knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with section 404(a)(1), 29
> U.S.C. § 1104(a)(1), in the administration of his specific
> responsibilities which give rise to his status as a fiduciary,
> he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary,
> unless he makes reasonable efforts under the circumstances
> to remedy the breach.

143.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary

responsibility.  Because ERISA permits the fractionalization of a fiduciary duty, there may be, as

in this case, several ERISA fiduciaries involved in a given decision, such as the role of company

stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit

their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The

result would be a setting in which a major fiduciary breach could occur, but the responsible party

could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary did not

participate in a breach, if he knows of a breach, he must take steps to remedy it.

> [I]f a fiduciary knows that another fiduciary of the plan has
> committed a breach, and the first fiduciary knows that this is a
> breach, the first fiduciary must take reasonable steps under the
> circumstances to remedy the breach. . . . [T]he most appropriate
> steps in the circumstances may be to notify the plan sponsor of the
> breach, or to proceed to an appropriate Federal court for
> instructions, or bring the matter to the attention of the Secretary of
> Labor. The proper remedy is to be determined by the facts and
> circumstances of the particular case, and it may be affected by the
> relationship of the fiduciary to the plan and to the co-fiduciary, the

duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

144.    Plaintiffs bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## VIII.   CAUSES OF ACTION

### COUNT I:

145.    Plaintiffs incorporate by this reference the paragraphs above.

146.    This Count alleges fiduciary breach against the following Defendants: the Company, the Director Defendants, and the Investment Committee Defendants (collectively, the "Prudence Defendants").

147.    As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

148.    As alleged above, the scope of the Prudence Defendants' fiduciary duties and responsibilities included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  Therefore, the Prudence Defendants were directly responsible for selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan, and directing the Trustee regarding same.  The Prudence Defendants were also responsible for, among other things, evaluating the merits of the Plan's investments on

an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

149.    Contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan.  Specifically, during the Class Period, the Prudence Defendants knew or should have known that MEMC no longer was a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in light of the Company's weaknesses.  Nonetheless, during the Class Period, the Prudence Defendants continued to offer MEMC Stock as an investment option for participant Plan contributions.  They did so despite evidence that (a) the Company had experienced material disruptions in its Texas and Italy facilities; (b) such disruptions had prevented the Company, to a material extent, from generating expected revenues; (c) the Company operated its productive facilities on a run-to-failure basis (but failed to disclose this information); and (d) as a result of the foregoing, the Company's previously issued guidance became lacking in any reasonable basis and required immediate revision.  This created severe financial circumstances that exposed the Plan to the risk of substantial losses.

150.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Company Stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In light of this, the Prudence Defendants were obliged to institute a regular, systematic procedure for evaluating the prudence of investment in Company Stock.

151.    Moreover, the Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in MEMC Stock, even though the situation described above posed a great danger to the Plan.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to maintain investment in MEMC Stock under these circumstances.

152.    The Prudence Defendants' decisions regarding the Plan's investment in MEMC Stock described above, under the circumstances alleged herein, constituted an abuse of fiduciary discretion because a prudent fiduciary acting under similar circumstances would have made different investment decisions.  A prudent fiduciary would not have reasonably believed that continued investment of the Plan's contributions and assets in MEMC Stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.

153.    The Prudence Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

154.    According to DOL regulations and case law interpreting the statutory provision above, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

155. Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

(a)     a determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

(b)     consideration of the following factors as they relate to such portion of the portfolio:

i.     the composition of the portfolio with regard to diversification;

ii.     the liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

iii.     the projected return of the portfolio relative to the funding objectives of the plan.

156. Given the conduct of the Company as described above, the Prudence Defendants did not act prudently when they continued to invest the Plan's assets in MEMC Stock because, among other reasons, these Defendants knew of and failed to investigate the failures of the Company.  Rather than remaining silent regarding the occurrences at its two facilities, the Prudence Defendants had a fiduciary duty to disclose:  (a) that the Company had experienced material disruptions at its two facilities; (b) that such disruptions would prevent the Company, to a material extent, from generating expected revenues and reach its previously issued guidance; and (c) that, as a result of the foregoing, the Company's previously issued guidance became lacking in any reasonable basis and required immediate revision.

157. As such, the risk associated with the investment in MEMC Stock during the Class Period was far above the normal, acceptable risk associated with investment in company stock. The Plan participants were unaware of this risk.  The Prudence Defendants knew or should have

known that Plan participants were unaware of the risk – as was the market generally – because these Defendants never disclosed it.

158.    Thus, given this inequity, the Prudence Defendants had a duty to avoid permitting the Plan or any participant to invest Plan assets in MEMC Stock.

159.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve conflicts promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. Certain Defendants were motivated to inflate the perceived success of the Company and boost its apparent performance, because the better the Company's performance and, consequently, the higher the price of the Company's Stock, the larger certain Defendants' salaries and incentive compensation.  Fiduciaries laboring under such conflicts must, in order to comply with the duty of loyalty, make special efforts to assure that their decision-making process is untainted by the conflict and is made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the Plan.

160.    The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by: (a) failing to engage independent advisors who could make independent judgments concerning the Plan's investment in MEMC Stock; (b) failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made MEMC  Stock an unsuitable investment for the Plan; (c) failing to take such other steps as were necessary to ensure that Plan participants' interests were loyally and prudently served; (d) failing to disregard the impact of their duty to avoid conflicts of interest on their own compensation; and

(e) placing their own and MEMC's improper interests above the interests of the participants with respect to the Plan's investment in MEMC Stock.

161.    Moreover, a fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those who they direct or who are directed by the plan, to do so.

162.    The Prudence Defendants breached this duty by: (a) continuing to offer MEMC Stock as an investment option for participants of the Plan; (b) continuing to invest assets of the Plan in MEMC Stock rather than in cash or other short-term investment options; and (c) engaging in this course of conduct when Defendants knew or should have known that MEMC Stock no longer was a prudent investment for participants' retirement savings.

163.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If the Prudence Defendants had discharged their fiduciary duties by prudently investing the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

164.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II:

165.   Plaintiffs incorporate by this reference the allegations above.

166.   This Count alleges fiduciary breach against the following Defendants: the Company and the Director Defendants (collectively, the "Monitoring Defendants").

167.   As alleged above, during the Class Period, the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

168.   The scope of the Monitoring Defendants' fiduciary responsibilities includes the responsibility to appoint and remove, and thus monitor the performance of other fiduciaries.  The Company exercises its Plan administrator functions through the Investment Committee Defendants with respect to the Plan.  Thus, it has a duty to monitor the Investment Committee Defendants.  Further, the Director Defendants were responsible for appointing, replacing, and monitoring the members of the Investment Committee Defendants.

169.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

170.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their

appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

171.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

172.    On information and belief, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plan's investment in Company Stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company Stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of MEMC's inappropriate business practices, and the likely impact of such practices on the value of the Plan's investment in MEMC Stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to maintain investments in MEMC Stock despite their knowledge of practices that rendered MEMC Stock an imprudent investment during the Class Period for participants' retirement savings in the Plan, and who breached their fiduciary duties under ERISA.

173.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

174.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III:

175.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

176.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

177.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty – that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

178.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities and

by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in MEMC Stock.

179.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided altogether.

180.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses, and indirectly the Plan's participants, lost a significant portion of their retirement investments.

181.    Pursuant to ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV:

182.    Plaintiffs incorporate by this reference the allegations above.

183.    This Count alleges co-fiduciary liability against all Defendants.

184.    As alleged above, during the Class Period Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

185.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach

and fails to remedy it, knowingly participates in a breach, or enables a breach. Defendants breached all three provisions.

186. ***Knowledge of a Breach and Failure to Remedy***. ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no effort to remedy those breaches. In particular, they did not communicate their knowledge of the Company's improper activity to the other fiduciaries.

187. MEMC, through its officers and employees, was unable to meet its business goals, withheld material information from the market, and profited from such practices. Thus, knowledge of such practices is imputed to MEMC as a matter of law.

188. Because Defendants knew or should have known of the Company's failures and inappropriate business practices, they also knew that Defendants were breaching their duties by continuing to maintain Plan investments in Company stock. Yet they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of MEMC's failed and inappropriate business practices and by obfuscating the risk that these practices posed to the Company, and, thus, to the Plan.

189. ***Knowing Participation in a Breach***. ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. MEMC knowingly participated in the fiduciary breaches of Defendants who failed to prudently and loyally manage the Plan in that it benefited from the sale or contribution of its stock at prices that

were disproportionate to the risks for Plan participants.  Likewise, the Monitoring Defendants knowingly participated in the breaches of Defendants who failed to loyally and prudently manage the Plan because, as alleged above, they had actual knowledge of the facts that rendered MEMC Stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted these Defendants to breach their duties.

190.    ***Enabling a Breach***.  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

191.    The Monitoring Defendants' failure to monitor the Investment Committee Defendants enabled that committee to breach its duties.

192.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost millions of dollars of retirement savings.

193.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), all Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## IX.   CAUSATION

194.    The Plan suffered millions of dollars in principal losses because Defendants imprudently invested the Plan's assets in MEMC Stock during the Class Period, in breach of Defendants' fiduciary duties.

195.    Defendants are liable for the Plan's losses in this case because the Plan's investment in MEMC Stock was the result of Defendants' decision to imprudently maintain the assets of the Plan in MEMC Stock.

196.    Had Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating MEMC Stock as an investment alternative when it became imprudent, and divesting the Plan of MEMC Stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## X.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

197.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in MEMC Stock during the Class Period.

198.    As a consequence of Defendants' breaches, the Plan suffered significant losses.

199.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

200.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investment available to them.

The Court should adopt the measure of loss most advantageous to the Plan.  In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

201.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of:  (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

202.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## XI.    CLASS ACTION ALLEGATIONS

203.    *Class Definition*. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Class"):

204.    All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between June 13, 2008 through the present, and whose accounts included investments in MEMC Stock.

205.    ***Class Period***. The fiduciaries of the Plan knew or should have known at least by June 13, 2008, that the Company's material weaknesses were so pervasive that MEMC Stock could no longer be offered as a prudent investment for the retirement Plan.

206.    ***Numerosity***. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to the Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, based on the Plan's Form 5500 for Plan year 2006, over 2,044 participants or beneficiaries in the Plan.

207.    ***Commonality***. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

- whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

- whether Defendants violated ERISA; and

- whether the Plan has suffered losses and, if so, what is the proper measure of damages.

208.    ***Typicality***. Plaintiffs' claims are typical of the claims of the members of the Class because: (a) to the extent Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claim on behalf of the Plan is not only typical to, but identical to a claim under this section brought by any Class member; and (b) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

209. ***Adequacy***. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

210. ***Rule 23(b)(1)(B) Requirements***. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

211. ***Other Rule 23(b) Requirements***. Class action status is also warranted under the other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XII.   <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for:

A.     A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.     An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan

resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

        C.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

        D.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in MEMC Stock;

        E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

        F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

        G.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

        H.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

Dated: June 1, 2009

                            Respectfully submitted,

                            **DYSART TAYLOR LAY COTTER & McMONIGLE P.C.**

                            By: /s/ Don R. Lolli
                                Don R. Lolli (#56263)
                            4420 Madison Avenue
                            Kansas City, MO 64111
                            Telephone: (816) 931-2700
                            Email: dlolli@dysarttaylor.com

                            ***Local Counsel for Plaintiffs***

**GAINEY & McKENNA**
Thomas J. McKenna
295 Madison Avenue
New York, NY 10017
Tel: (212) 983-1 300
Fax: (212) 983-0383
Email:  tjmlaw2001@yahoo.com
   tjmckenna@gaineyandmckenna.com

*Lead Counsel for Plaintiffs*