UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JERRY JONES AND MANUEL ACOSTA, )
on behalf of themselves and all others )
similarly situated, )
)
        Plaintiffs, )
)
v. )     Case No. 4:08CV1991 HEA
)
SUN EDISON., INC., et al., )
)
      Defendants, )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss, [Doc. No. 20].  Plaintiffs oppose the motion and the parties have extensively and arduously briefed the issues.  For the Reasons set forth below, the Motion is granted.

### Facts and Background

Plaintiff,[1] on behalf of himself, and a class of all other similarly situated Plan participants, have brought this action under the Federal Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA") against the

---

[1] On June 28, 2011, Plaintiff Jerry Jones withdrew as a plaintiff in this action, thus, the only remaining named Plaintiff is Manuel Acosta.

fiduciaries of the MEMC Electronics Materials, Inc.[2] 401(k) Savings Plan (the Plan) for violations of ERISA.   Plaintiff contends the following:

The Plan is a retirement plan sponsored by MEMC. (MEMC Retirement Savings Plan (2002) Restatement ("Plan Document"), Article II, § 2.21). Plaintiffs' claims arise from the alleged failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the period June 13, 2008 through June 1, 2009.  (the "Class Period").

Allegedly, Defendants allowed the imprudent investment of the Plan's assets in MEMC common stock ("MEMC Stock" or "Company Stock") throughout the Class Period, even though they knew or should have known that such investment was unduly risky and imprudent. The Company's serious mismanagement and improper business practices led to the artificial inflation of MEMC Stock. As a result, MEMC Stock was an unduly risky and inappropriate investment option for Plan participants' retirement savings during the Class Period.

---

[2] MEMC Electronics Materials, Inc. has changed its name to SunEdison, Inc.  For the sake of consistency, the Court will refer to Defendant as MEMC throughout this Opinion.

In Count I, Plaintiff alleges that certain Defendants, each having specific responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plan and Plan participants by failing to prudently and loyally manage the Plan's investment in Company securities by (a) continuing to offer MEMC Stock as a Plan investment option when it was imprudent to do so; (b) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in MEMC Stock; and (c) maintaining the Plan's pre-existing investment in MEMC Stock when Company stock was no longer a prudent investment for the Plan.

In Count II, Plaintiff alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/ administration of Plan assets was delegated, despite the fact that Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering MEMC Stock as an investment option and investing Plan assets in MEMC Stock when it was no longer prudent to do so.

In Count III, Plaintiff alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "singleminded" fiduciaries with the best interests of the Plan and Plan participants solely in mind.

- 3 -

In Count IV, Plaintiff alleges that Defendants breached their duties and responsibilities as co-fiduciaries by knowing of breaches of fiduciary duties and failing to remedy them, knowingly participated in the breaches of fiduciary duties, and/or enabling the breaches of fiduciary duties.

During the Class Period, Defendants (with responsibility for the Plan's investments) imprudently permitted the Plan to hold and acquire tens of millions of dollars in MEMC Stock despite the Company's serious mismanagement and improper business practices. Based on publicly available information for the Plan, Defendants' breaches have caused a loss of millions of dollars of retirement savings.

Plaintiff brings this action on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are allegedly personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiff to sue in a representative capacity for losses allegedly suffered by the Plan as a result

of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested in MEMC Stock during the Class Period.  Because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are made by necessity on information and belief.

Plaintiff Manuel Acosta is a resident of St. Charles County in the State of Missouri. He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held MEMC Stock in the Plan during the Class Period.

Defendant MEMC is a Delaware corporation with its principal executive offices located at 501 Pearl Drive, St. Peters, Missouri. MEMC designs, manufactures, and sells silicon wafers for the semiconductor industry worldwide. The Company is the Plan Sponsor.  MEMC has the power to appoint the Plan Administrator to serve at its pleasure.  The Company also has the power to appoint the Plan Investment Committee.  The Company reserves the right to change or terminate the Plan at any time and for any reason.

Defendant Nabeel Gareeb ("Gareeb") was, at relevant times, the Company's Chief Executive Officer ("CEO") and a Director of the Company. Defendant

Gareeb resigned as President and CEO on November 12, 2008, but remained fully employed by the Company through December 31, 2008. During the Class Period, Defendant Gareeb was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendant Ahmad R. Chatila ("Chatila") was, as of March 2, 2009 to the present, President, CEO and a Director of the Company. During this time, Defendant Chatila was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendant Peter Blackmore ("Blackmore") was, at relevant times, a Director of the Company. During the Class Period, Defendant Blackmore was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or

discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendant Marshall Turner ("Turner") was, at relevant times, a Director of the Company. During the Class Period, Defendant Turner was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendant Robert J. Boehlke ("Boehkle") was, at relevant times, a Director of the Company. During the Class Period, Defendant Boehkle was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendant John Marren ("Marren") was, at relevant times, the Chairman of

the Board of the Company. During the Class Period, Defendant Marren was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendant C. Douglas Marsh ("Marsh") was, at relevant times, a Director of the Company. During the Class Period, Defendant Marsh was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendant William E. Stevens ("Stevens") was, at relevant times, a Director of the Company. During the Class Period, Defendant Stevens was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority

- 8 -

or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendant James B. Williams ("Williams") was, at relevant times, a Director of the Company. During the Class Period, Defendant Williams was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendant Michael McNamara ("McNamara") was, at relevant times, a Director of the Company. During the Class Period, Defendant McNamara was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

Defendants Gareeb, Chatila, Blackmore, Turner, Boehkle, Marren, Marsh,

Stevens, Williams and McNamara are herein referred to as the "Director Defendants." The Director Defendants are fiduciaries of the Plan as they have general responsibility for the investment of Plan assets. Plan Document, Article XIII, § 13.6

Defendant Plan Investment Committee (the "Investment Committee") was, at all relevant times, a named fiduciary of the Plan. Pursuant to the Plan Document, Article XIII, § 13.6, the Investment Committee was allocated the following power and authority: To establish investment policies; to appoint, monitor and remove a Trustee or Trustees; to appoint, monitor and remove Investment Managers, if any; and to select investment Funds in accordance with Article VIII.

Further, pursuant to the Plan Document, Article XIII, § 13.7: If a Committee is serving as Plan Administrator or as the Plan Investment Committee, an action of the Committee shall be valid if concurred in (a) by a majority of the members then serving at a meeting of which all members receive reasonable advance notice, or (b) unanimous written consent in lieu of a meeting. A member may participate in a meeting by means of conference telephone or similar communications equipment.

A Committee may appoint one or more of its members to carry out

any particular duty or duties or to execute any and all documents.  Any documents so executed shall have the same effect as if executed  by all such persons. Such appointment shall be made by an instrument in writing that specifies which duties and powers are so allocated and to whom each such duty or power is so allocated.

The Plan Administrator and Plan Investment Committee "may delegate to any agents such duties and powers, both ministerial and discretionary, as the Plan Administrator or Plan Investment Committee deems appropriate, by an instrument in writing which specifies which duties are so delegated and to whom each such duty is so delegated.

The Investment Committee has the power and authority to select the Trustee(s).   The Investment Committee has the power and authority to remove the Trustee(s).  The Investment Committee has the power and authority to "deliver to the Trustee and each Investment Manager an investment policy that sets out the guidelines for the investment of the assets over which the trustee or Investment Manager has discretionary control."  The Investment Committee "may add, change or eliminate investment alternatives at any time or from time to time." During the Class Period, the Investment Committee was comprised of the following Company employees:

(a) Defendant Kenneth H. Hannah ("Hannah") was, at all relevant times,

Senior Vice President and Chief Financial Officer. Defendant Hannah was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets; (b) Defendant Mignon Cabrera ("Cabrera") was Senior Vice President of Human Resources of MEMC. As of May 6, 2009, Defendant Cabrera no longer serves as Senior Vice President, Human Resources for the Company. During the Class Period, Defendant Cabrera was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets; (c) Defendant Jairaj Chetnani ("Chetnani") was, at all relevant times, Treasurer.  Chetnani was a fiduciary within the meaning of ERISA because he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets; (d) Defendant Brandi Wallace ("Wallace") was, at all relevant times, Manager of Benefits of the Company. During the Class Period, Defendant Wallace was a fiduciary within the meaning of ERISA because she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or

control with respect to the management of the Plan's assets; and (e) Defendant

James Welsh ("Welsh") was, at all relevant times, Manager of Benefits. During the

Class Period, Defendant Wallace was a fiduciary within the meaning of ERISA

because he possessed discretionary authority or discretionary responsibility in the

administration of the Plan, and he exercised authority or control with respect to the

management of the Plan's assets.

Defendants John Does 1-10 ("John Does 1-10") are residents of the United

States and are or were fiduciaries of the Plan during the Class Period. These

defendants whose identities are currently unknown to Plaintiffs, may include

additional MEMC employees.

The Plan, sponsored by MEMC, is a defined contribution plan. The Plan is a

legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

However, in a breach of fiduciary duty action such as this, the Plan is neither a

defendant nor a plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and

the law interpreting it, the relief requested in this action is for the benefit of the

Plan and its participants and beneficiaries.  The Plan is a voluntary contribution

plan whereby participants make contributions to the Plan ("Voluntary

Contributions") and direct the Plan to purchase investments with those

contributions from options pre-selected by Defendants which are then allocated to

participants' individual accounts.  Pursuant to the Company's 2008 Form 11-K,

Plan participants can direct their accounts to be invested in MEMC Stock Fund,

along with eleven (11) other funds offered by the Plan as investment options.

The Company selects the investment assets in the Plan. MEMC Retirement

Plan Service Agreement.   The Plan is a retirement plan.  Generally, all

employees of MEMC Electronic Materials, Inc. (the Company) who are

compensated in U.S. dollars from a payroll location with the United States are

eligible to participate in the Plan.

Putnam Fiduciary Trust Company serves as the trustee of the Plan.

Pursuant to the 2008 Form 11-K:  The Plan permits voluntary contributions

from participants up to 100% of their compensation. Such contributions are

credited directly to the participants' accounts and are fully vested.  Contributions

may be allocated to the available investment options at the discretion of the

participant. Gains and losses under the Plan are valued on a daily basis and

allocated to participant accounts based on account balances.

MEMC employees may elect to contribute from 1% to 50% of his/her

covered compensation as described in the Plan on a before-tax basis. The before-

tax contribution is limited to the amount specified by Section 402(g) of the

Internal Revenue Code ($15,500 and $15,000 in 2007 and 2006, respectively). A

Plan participant is also eligible to receive employer matching contributions of 100% of the first 3% of the employee's contribution for the Plan year; 50% of the next 2% contributed, and 20% of the next 1% contributed, up to 4.2% of the participant's covered compensation for the Plan year.

As of December 31, 2007, the Plan held $33,326,853 of MEMC's Stock. The Plan documents do not mandate that MEMC Stock be offered in the Plan. Pursuant to the Trust Agreement, "[n]otwithstanding the investment Characteristic of a Fund, the assets of any Fund may be invested in obligations of the United States Government, commercial paper, certificates of deposits, money market deposit accounts, money market mutual funds, savings accounts and/or short-term investments . . . ."

The Plan incorporates by reference the Company's SEC filings.  In addition, the Company's Form S-8, dated Jan. 2, 1997, incorporates the Company's SEC filings and all subsequently filed Company documents (*i.e.*, Form 10-Ks, Form 10-Qs, Form 8-Ks, and Form 11-Ks) with the SEC.

During the Class Period, a significant amount of the Plan's assets were invested in MEMC Stock.  As of December 31, 2007, the Plan held approximately $33,326,853 in Company Stock. 2008 Form 11-K at 2. Following revelations that Defendants misrepresented or failed to disclose that: (a) the Company had

experienced material disruptions in its Texas and Italy facilities; (b) such disruptions had prevented the Company, to a material extent, from generating expected revenues; (c) the Company operated its productive facilities on a run-to-failure basis; and (d) that, as a result of the foregoing, the Company's previously issued guidance became lacking in any reasonable basis and required immediate revision, the price of MEMC Stock decreased dramatically.

On July 23, 2008, MEMC shocked investors (which included Plan participants) when it disclosed, for the first time, that in June 2008 there was a failure of a heat-exchanger at the Company's Merano, Italy facility that reduced the Company's second quarter polysilicon output by almost five percent. Additionally, on that same date, MEMC stated that a loose pipe fitting caused a fire on June 13, 2008 at the Company's Pasadena, Texas facility, which resulted in a shutdown of half the silane production in that facility for approximately a week. This was the first revelation that the Company had suffered these significant problems at its production facilities. These problems caused MEMC's second quarter net sales to be over $8 million less than the bottom range of the financial guidance that the Company issued in April 2008.

As a result of this news, MEMC's shares fell $11.57 per share, or 21.51%, from July 23, 2008 to close on July 24, 2008 at $42.23 per share, on unusually

heavy trading volume.  As a result, the Plan incurred substantial losses due to its investment in MEMC Stock.

Despite the Plan's substantial investment in MEMC Stock, Defendants failed to protect the Plan from the risks that resulted from the Company's reckless and improper conduct.  Defendants continued to hold the Plan's shares of MEMC Stock and compounded the problem (and the losses) by purchasing additional shares during the Class Period. Plaintiffs estimate a principal loss of millions of dollars.

ERISA requires every plan to have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions. *See* ERISA § 3(21)(A)(I), 29 U.S.C. § 1002(21)(A)(I). Thus, a person is a fiduciary to the extent "(I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with

- 17 -

respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." *Id.*

Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants in the manner and to the extent set forth in the Plan's documents, under ERISA, and through their conduct.  As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and the claims against each Defendant are based on such specific discretion and authority.

Instead of delegating all fiduciary responsibility for the Plan to external service providers, MEMC chose to delegate its responsibility regarding the

- 18 -

administration of the Plan to the Investment Committee.  MEMC chose to assign the appointment and removal of fiduciaries to itself, which, in turn, selected the members of the Investment Committee.

ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions. ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3). However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

Plaintiff believes that in order to comply with ERISA, the Company exercised responsibility through the Investment Committee for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA.  In this regard, the Company and the Investment Committee disseminated the Plan's documents and related materials, which incorporated by reference, among other things, MEMC's allegedly inaccurate SEC filings, thus converting such materials into fiduciary communications.

The Company is also charged with the appointment, monitoring, and removal of the Investment Committee.  Moreover, on information and belief, MEMC exercised control over the activities of its employees who performed

fiduciary functions with respect to the Plan, including the Investment Committee. MEMC, on information and belief, can hire or appoint, terminate, and replace such employees at will. Thus, MEMC is responsible for the activities of its employees as fiduciaries with respect to the Plan through traditional principles of agency and *respondeat superior* liability.  Under basic tenets of corporate law, MEMC is imputed with the knowledge its officers and employees (which include the other Defendants) had regarding the alleged misconduct, even if such knowledge is not communicated to MEMC.

Consequently, MEMC was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period because it exercised discretionary authority or discretionary control over the management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority over or discretionary responsibility for the administration of the Plan.

Pursuant to the Plan Document, "the Plan Investment Committee shall have the general responsibility for the investment of Plan assets, as authorized by the Board of Directors of the Sponsor."  The Director Defendants (Defendants Gareeb, Chatila, Blackmore, Turner, Boehkle, Marren, Marsh, Stevens, Williams and

- 20 -

McNamara) were *de facto* fiduciaries of the Plan within the meaning of ERISA §

3(21), 29 U.S.C. § 1002(21), during the Class Period because they exercised

discretionary authority or discretionary control over the management of the Plan,

exercised authority or control over the management or disposition of the Plan's

assets, and/or had discretionary authority over or discretionary responsibility for

the administration of the Plan.

During the Class Period, the Company relied on the Investment Committee

Defendants to carry out its fiduciary responsibilities under the Plan and ERISA.

As a result, the Investment Committee Defendants are both named and functional

fiduciaries under ERISA.  The Investment Committee Defendants (Hannah,

Cabrera, Chetnani, Wallace, and Welsh) are named fiduciaries of the Plan

pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto*

fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. §1002(21),

during the Class Period because they exercised discretionary authority or

discretionary control over the management of the Plan, exercised authority or

control over the management or disposition of the Plan's assets, and/or had

discretionary authority over or discretionary responsibility for the administration of

the Plan.

During the Class Period, Plaintiff alleges that MEMC Stock became an

- 21 -

imprudent investment for participants' in the Plan because (a) the Company had experienced material disruptions in its Texas and Italy facilities; (b) such disruptions had prevented the Company, to a material extent, from generating expected revenues; (c) the Company operated its productive facilities on a run-to-failure basis (but failed to disclose this information); and (d) as a result of the foregoing, the Company's previously issued guidance became lacking in any reasonable basis and required circumstances that exposed the Plan to the risk of substantial losses.

MEMC's inaccurate statements increased the risk of loss by contributing to the artificial inflation of the value of Company Stock.

MEMC is a manufacturer and seller of polysilicon wafers and related intermediate products to the semiconductor and solar industries.  According to MEMC's website (http://www.memc.com), the Merano, Italy facility manufactures single crystal ingots and polysilicon. The MEMC Pasadena, Texas facility produces semiconductor-grade granular polysilicon, monosilane and SiF4 gases and semiconductor-grade silicon powder. The ultra-pure granular polysilicon manufactured at the MEMC Pasadena facility is the base material for manufacturing of silicon wafers.

Since 1995, MEMC Pasadena facility has expanded from the original

capacity of approximately 1,100 metric tons of semiconductor-grade polysilicon per year to an estimated 4,400 metric tons per year. Upon information and belief, a proposed, additional expansion will increase production capacity to approximately 5,000 metric tons of semiconductor-grade polysilicon per year. According to an article published on April 3, 2008 in *Semiconductor International* entitled "MEMC Fixing Buildup Issues at Texas Polysilicon Facility," the Pasadena facility accounts for two-thirds of MEMC's total polysilicon capacity.

Polysilicon has several commercial applications, including silicon wafers and solar panels. Refined polysilicon – the semiconductor substrate used for integrated circuits – is a component part of semiconductor-grade silicon wafers. Polysilicon manufacturing technology is highly technical and while some aspects are patented, companies maintain proprietary manufacturing processes and seek to keep the details of their methods of manufacturing known only to themselves.

MEMC manufactures a number of high-grade silicon products, including the OptiaTM and AegisTM silicon wafers, for use in advanced device technologies, as well as component parts. The wafers such as those manufactured and produced by MEMC are the foundation upon which virtually all of the world's semiconductors are built. Those products are the building blocks for the $1 trillion electronic market (*i.e.*, cell phones, computers, PDSs, CD/DVD players, satellite and

- 23 -

automotive electronics, etc.).

The demand for semiconductor-grade polysilicon has increased at a rapid rate from 1995 to the present. This upward trend is expected to continue as the worldwide demand for polysilicon continues to grow, along with the advancement of the computer and electronics industries, and technology dependent on silicon wafers and demand for photovoltaic panels.

Prior to the Class Period, MEMC's financial results had been negatively impacted by production problems at its Pasadena, Texas facility that materially impacted the Company's financial results for the periods ended September 30, 2007, December 31, 2007 and March 31, 2008. According to an article published on *Seeking Alpha* on September 5, 2007, entitled "MEMC Cuts Q3 Guidance Due To Pasadena Construction Accident," the Pasadena, Texas facility accounts for 70% of MEMC's total production.

On September 4, 2007, the Company issued a press release entitled "MEMC Provides Updated Third Quarter Guidance." This press release discussed a construction accident at the Company's Pasadena, Texas facility that caused it to lower its third quarter 2007 guidance by approximately 5%. This press release was filed with the SEC and was incorporated into Plan documents. It was therefore a fiduciary communication to Plan participants.

- 24 -

On October 5, 2007, the Company issued a press release entitled "MEMC Reports Third Quarter Results." It was in this press release the Company reported results of operations for the quarter ended September 30, 2007, which included the previously disclosed construction accident: "The impact associated with the previously disclosed construction incident at the company's Pasadena polysilicon manufacturing facility was the primary factor contributing to the sequential reduction in gross margin."  It was in this same October 5, 2007 press release that Defendant Gareeb stated that "the extended effects of the [construction] incident caused [the Company] to lose well over a week's worth of production, miss our cost projections by the double digit millions, and delay our expansion."

As stated in a news article in *IndustryWeek*, dated October 11, 2007, "such unplanned power disruptions at technologically sophisticated plants like MEMC's mean a long startup and recalibration process and both the short-and long-term repercussions were severe."

On October 25, 2007, the Company held an earnings conference call to discuss its third quarter 2007 results. It was at this earnings conference call that Defendant Gareeb further discussed the construction incident, stating in relevant part: "To give an update on Pasadena, as you know, a construction incident caused by electrical subcontractor resulted in a power outage to our Pasadena polysilicon

- 25 -

manufacturing facility. […] We have recovered from this discrete event to a steady

state rate of production and are pleased to indicate that we are targeting to achieve

the level of Q4 revenue targeted prior to the construction incident and be

able to recover some of the lost revenue from Q3."

On January 24, 2008, the Company issued a press release entitled "MEMC

Announces Fourth Quarter & Full Year Results." It was in this press release that

the Company issued results of operations for the quarter and year ended December

31, 2007. Defendant Gareeb also stated in relevant part:

> Based on customer input, we are targeting first quarter 2008 sales
> to be approximately $560 million. In addition, we are targeting
> margins to be approximately flat to slightly up compared to the
> exceptional fourth quarter. Operating expenses are targeted to be
> approximately $42 million as a result of the timing of stock
> compensation expenses within 2008.

On that same day, the Company also held an earnings conference call to

discuss its fourth quarter 2007 results. The Company also discussed at this

conference call its production problems at the Texas facility:

> **Gordon Johnson** - Lehman Brothers: Okay. And then lastly, I
> guess on the revenue line, a bit softer than expected this quarter.
> Can you talk a little bit about kind of what drove that?

> **Gareeb**: Yes. On the revenue in Q4, really what the issue with the
> revenue shortfall from our target as kind of alluded to in statement
> was that we ended up needing to do maintenance on some pieces
> of poly equipment in our Pasadena, Texas facility in December,

- 26 -

in the last week really of December rather than in January as we had originally anticipated. And you can try to predict these things, but you can't, it's not very scientific. And our expansion that was coming online was really planned to offset that maintenance activity in January, not in December. So instead of growing by 15% sequentially, we grew by 13%, and margins you saw what happened up well over 400 bases points. And so really, it was about a 1 day's impact, even though we did the some of that maintenance in the fourth week.

\* \* \*

**Tim Luke** - Lehman Brothers: Thanks Nabeel, couple of quick questions. Just if you can comment what are the milestones going forward now on your payment schedule and I was just wondering if you could clarify again in terms of the one day disruption that you saw that impact the fourth quarter revenue. Can you just clarify what that was again? Thanks.

**Gareeb**: So the fourth quarter piece Tim, the net affect was basically one days worth of production that you saw in that approximately $5 million off the target that we had articulated it wasn't the . . . .

**Tim Luke** - Lehman Brothers: When did that come . . . when did you get that disruption?

**Gareeb**: Right, so it wasn't a lets call it a disruption, call it early maintenance really. We had anticipated that semi-annual maintenance would be occurring in the January, February time table and basically because of the shut down in September some of those pieces of equipment weren't running at a 100% operational efficiency. And so you can't really predict this plus, minus in a couple in a weeks and we thought it would happen January, February we had to basically take them down in the 4th late 3rd week, early 4th week of December and do some maintenance on them. And so that really cause[d] the shortage of poly which ripples through the entire pipeline. That's obviously behind us and we did some maintenance on that in December, we did some maintenance on that this week and we'll do some again in probably late

- 27 -

this quarter and so the expansion will offset those maintenance activities in this quarter.

Defendant Hannah also discussed on this conference call the problem at its Texas facility that caused the Company to miss its revenue target by about $5 million. Defendant Hannah stated in relevant part that ". . . we missed our revenue target by less than one days worth of production due to earlier than planned maintenance activity required on our polysilicon equipment in Texas."

On April 3, 2008, the Company issued a press release entitled "MEMC Provides First Quarter Update," announcing the results of the Company's operations for the quarter ended March 31, 2008. In discussing the reasons behind the guidance, the Company stated in relevant part:

> The company reported that during the first quarter it experienced accelerated buildup of chemical deposits inside the new expansion unit ("Unit 3") at its Pasadena, Texas facility. These buildups occurred multiple times, and each instance required downtime of several days for premature maintenance to clean and re-stabilize the unit. The company also delayed the remaining maintenance (from the prior quarter) on the existing units ("Unit 1" and "Unit 2") waiting for Unit 3 to stabilize, but eventually had to perform the maintenance on Unit 2. The combination of these items caused the utilization of the Pasadena facility to be approximately 20% lower than the fourth quarter, resulted in much lower than anticipated output, and caused the company to not achieve the financial targets for the first quarter as disclosed on January 24, 2008.

Shortly thereafter, on April 24, 2008, the Company issued another press

release entitled "MEMC Reports First Quarter Results," announcing the results of

operations for the quarter ended March 31, 2008. It was in this press release that

Defendants Gareeb stated in relevant part:

> Regarding our production and maintenance efforts in Pasadena,
> our new unit (Unit 3) has demonstrated good results, and the
> announced maintenance activities on our pre-existing unit (Unit
> 1) have been completed.

> Demand indications from semiconductor application customers are
> a bit weaker than typical, resulting in additional price declines
> from first quarter levels. Demand from solar application customers,
> however, continues to be strong. Although we are pleased with
> the results of the actions we have taken to address the issues that
> caused the lower than targeted polysilicon volume in the first
> quarter, given the unplanned issues that were encountered with
> our expected polysilicon ramp in the first quarter, we feel it is
> prudent to be extra cautious regarding our polysilicon output
> expectations in the second quarter. As a result, we are targeting
> revenues of approximately $540 to $570 million for the second
> quarter. In addition, we are targeting gross margin of
> approximately 54%-55%, with operating expenses of less than $40
> million.

> Regarding our polysilicon expansion, we are currently
> targeting to achieve mechanical completion of Unit 4 (silane unit) in
> our Pasadena facility before the end of the second quarter, as well as
> additional polysilicon reactor capacity in the third quarter. This
> combination will mark the mechanical completion of our 8,000
> metric tons of capacity which was originally targeted for the end of
> 2008. Depending on the output ramp of the different units, this
> improved installation schedule may allow us to make good
> progress toward achieving our annual financial targets in the
> second half of 2008.

Defendant Gareeb's discussion regarding production matters at the Texas

facility clearly demonstrates that each day of production was extremely important in order to meet the Company's production goals. In fact, during a Company conference call for the first quarter 2008, Defendant Gareeb stated in relevant part that "Unit 1, as we had said, was down for maintenance. Obviously that maintenance is now complete. That maintenance took a few days longer because we had run it to failure and so it took a little bit longer to clean up."

It was also in the first quarter 2008 conference call that Defendant Gareeb provided investors (which included Plan participants) with an update on the Texas facility:

> To give you an update on Pasadena, as you know, accelerated chemical deposits experienced inside our expansion unit, Unit 3, resulted in reduced output for the quarter. On our update call earlier this month, we reported that Unit 3 was ramping, but Unit 2 was running with good output and that Unit 1 was undergoing maintenance. Since then, maintenance on Unit 1 has been completed and Unit 3 has demonstrated good results. While  we are encouraged by the progress and are trying to be more cautious than normal, we are still providing second quarter targets that would result in strong sequential growth in revenue and margins.
>
> In the near term, I remain encouraged by our progress on our polysilicon expansion. We are currently targeting to achieve mechanical completion of our Unit 4 silane unit before the end of the current quarter, as well as additional polysilicon reactor capacity in the third quarter. This combination will mark the mechanical completion of our targeted 8,000 metric tons of polysilicon capacity, which was originally targeted for the end of 2008.

On April 24, 2008, the Company also issued a press release entitled

"MEMC Provides Status Update After Raw Material Release" reporting that a

transfer line developed a leak and caused a release of raw material gas. The press

release stated in relevant part: "At this stage, the company anticipates that

production will resume on Friday, April 25, 2008 and does not anticipate any

impact to the financial targets provided earlier today as a result of this incident."

Investors (including Plan participants) were kept current of the status of the

impact of this event as the Company issued a second release on April 29, 2008,

confirming that production at its Pasadena facility did, in fact, resume on April 25,

2008 and all three of the facility's silane units were operational.  The Company

had set a precedent for promptly informing investors (and Plan participants) of

adverse potential impact on production and confirming that the prompt resumption

of production after such an event. Further, for example, in the third and fourth

quarters of 2007 and the first quarter of 2008, the Company provided two timely

updates on previously issued guidance when an event possibly affecting

production, and thus that guidance, had taken place and issued two additional

press releases regarding events even when the Company did not believe there

would be an impact on production. Having established this precedent, the

Company created an expectation that it would, and thus had a duty to, promptly

- 31 -

disclose events that might impact production that the Company had reason to believe would be of importance to investors (which included Plan participants).

Given its past production problems and the adverse impact such problems had on the Company's financial condition, Defendants were well aware that investors (including Plan participants) would find any production problems to be highly material. In fact, during the first quarter 2008 press release, Defendants stated that "we feel it is prudent to be extra cautious regarding our polysilicon output expectations." Because Defendants were being "prudent," investors (including Plan participants) were left to believe that in the event anything occurred that might knowingly (to Defendants) reduce revenue indicated in their previous guidance, the Company would promptly disclose such information.

On June 5, 2008, the Company met with analysts from Deutsche Bank and, after the meeting, on June 6, 2008, Deutsche Bank issued a report stating in part, that "[w]e hosted MEMC Electronics management in San Francisco yesterday, and while the company offered no new or incremental guidance, we are increasingly convinced that recent production issues are largely resolved, that silicon pricing remains very strong, and that semiconductor industry pricing weakness will likely be compensated for by solar PV business strength. We maintain our Buy rating."

On June 13, 2008, a fire erupted at the Company's Pasadena facility
(brought on by a loose pipe fitting) and as a result caused the Company's silane
production to be shut down.  MEMC did not disclose the event. Also in June 2008,
a heat-exchanger at MEMC's Merano, Italy facility failed, causing an interruption
in the Company's polysilicon output at that plant.

Given MEMC's past production issues and the precedent it set by promptly
informing investors (including Plan participants) of any events that would
potentially impact production, at the beginning of the Class Period, Defendants
should have informed Plan participants (and the investing community) about the
problems at MEMC's Pasadena, Texas and Merano, Italy facilities, but failed to do
so.  Rather than remaining silent regarding the occurrences at its two facilities,
MEMC had a duty to disclose: (a) that the Company had experienced material
disruptions at its two facilities; (b) that such disruptions would prevent the
Company, to a material extent, from generating expected revenues and reach its
previously issued guidance; and (c) that, as a result of the foregoing, the
Company's previously issued guidance became lacking in any reasonable
basis and required immediate revision.

The fire caused the Company's silane production at the Texas facility to be
shut down for a week. In short, there was a strong possibility that such an

interruption in production would have an adverse impact on earnings and would cause the Company's previously published financial projections to be inaccurate. Similarly, the failure of the heat exchanger in the Merano, Italy plant caused an interruption in the Company's production of polysilicon. There was also a strong possibility that such an interruption in production would have an adverse impact on earnings and would cause the Company's previously published financial projections to be inaccurate.

During the June 23, 2008 earnings call, discussed below, Defendant Gareeb admitted that the Company knew that the previously issued guidance lacked any reasonable basis. Defendant Gareeb stated in relevant part: "And so we didn't take that as a pre- announcement in terms of doing it earlier in this quarter if you will, primarily because we didn't think 2% outside the bottom end of the range was material if you will." The production issues at the Company's Italian facility and the Pasadena facility combined, Defendants knew, yet failed to timely disclose, would materially adversely impact the Company's financial results for the period ended June 30, 2008.

On July 23, 2008, after the close of the market, MEMC filed a Form 8-K with the SEC, disclosing (for the first time) that its financial results were below the bottom end of its targeted range as it encountered unanticipated events toward

the tail end of the quarter. The Company attributed the miss to: "The premature failure of a relatively new heat-exchanger at the company's Merano, Italy facility in June [which] reduced the company's second quarter polysilicon output by just under five percent." The Form 8-K also disclosed "a loose pipe fitting [which] caused a fire at the company's Pasadena facility that required a shut down of half the silane production . . . for approximately a week."

It was in this same press release that Defendant Gareeb stated in relevant part:

> MEMC grew sales by 6% sequentially, expanded gross and operating margins by 150 and 200 basis points, respectively, continued to generate industry-leading levels of free cash flow at 22% of sales, and further expanded our cash and investment balances to approximately $1.5 billion. However, our financial results were a bit below the bottom end of our targeted range as the company encountered unanticipated events towards the tail end of the quarter.
> The premature failure of a relatively new heat-exchanger at the company's Merano, Italy facility in June reduced the company's second quarter polysilicon output by just under five percent. The output from the company's Pasadena, Texas facility during the month of May and early part of June (shown on the attached silane and polysilicon output charts) had positioned the company on a trajectory to exceed the upper end of the company's targeted second quarter revenue range. Unfortunately, a loose pipe fitting caused a fire at the company's Pasadena facility that required a shut down of half the silane production commencing on Friday June 13. Even though the complications lasted for approximately a week, the Pasadena facility recovered and managed to produce enough silane and polysilicon during the remainder of the quarter to be in the middle of that facility's targeted range for second

quarter production, but there was not enough Pasadena production
to completely offset the Merano shortfall.

While we are disappointed that we experienced an
uncharacteristic event at our Merano facility, we are pleased that
we were able to limit the impact to a few percent below the
targeted revenue range. This was primarily a result of the
accomplishments in the second quarter that helped to offset the
Merano shortfall. Specifically, we:

-- Achieved strong output from Unit 3 in Pasadena,
overcoming most of the issues that held us back in the first quarter.

While output was limited by the fire incident and its associated
complications, the unit has recovered well.
-- Completed and ramped Unit 4 in Pasadena over a month
prior to the end of the quarter, with the unit running at good rates
save for the interruption of the fire incident.

Also, on July 23, 2008, the Company held a conference call to discuss the

second quarter 2008 financial results. It was at this conference call that Defendant

Gareeb provided an overview of why the Company's financial results were below

the low end of the range. Defendant Gareeb stated in relevant part:

So let's start with a summary of what caused us to miss our
targeted range of results. The premature failure of the heat
exchanger that was relatively new at our Merano facility in June,
reduced the company's total second quarter polysilicon output by
just under 5% for the quarter. While Pasadena had been
running enough ahead of schedule to offset the Merano
shortfall, complications there from a loose pipefitting and
resulting fire caused us to shut down half the silane production
on June 13th.

And while the facility recovered from this fairly quickly and

manage to produce enough silane and polysilicon to be in the middle of its targeted range for production, Pasadena could not produce enough product fast enough to offset the Merano shortfall and allow us to finish the quarter within our targeted band of revenue.

I am disappointed that we were not able to avoid additional unexpected events in Q2 or result the complications Merano faster or produce more polysilicon in Pasadena to offset all the Merano shortfalls. However, what I am pleased and excited about is the following: First, in Pasadena, Unit 3 overcame the issues that held us back in Q1 although with some limitations due to the fire, but has recovered well. Second, Unit 4 was started up over a month prior to the end of the quarter and has ramped and run at good rates other than interruption of the fire.

Third, the combined output from Units 3 and 4 during May and early June alone had positioned us on a trajectory to finish the quarter ahead of the upper end of our targeted revenue range and the strong output allowed us to offset a portion of the Merano shortfall in the last week of June.

Fourth, we have completed this technically and operationally challenging phase of silane expansion in Pasadena, and now have a high level of confidence in the longer-term performance of Units 3 and 4. We expect this should eliminate silane production as a constraining element. Fifth, we have mechanically completed the two additional poly-reactors in Pasadena, where the ramp is scheduled to begin next week. As a result of these installations, we are now at 75 to 100 metric tons of annualized poly capacity, have a number of […] record number rectors available to produce poly, and have demonstrated good output in July.
Last, but not least, we have replaced the heat exchanger on Merano, started the expansion and are on track to finish the expansion and phases in August 1st, and September 1st, which will get us to the 8,000 metric tons of annualized capacity before the end of the third quarter. So, I would like to put all these events in perspective. Although we have had a difficult first half of this

- 37 -

year, with ramps and unexpected events and discoveries, we have achieved numerous milestones and demonstrated capability for extended periods of time that have positioned us for significant growth in the second half of this year versus the first half. This is what we had hoped to accomplish when we last talked in our April call.

.

Further, it was during this same earnings call that an analyst from

Oppenheimer questioned Defendant Gareeb about his failure to timely disclose

these incidents as the Company has done in the past:

**Sam Dubinsky – Oppenheimer**: Hey guys couple of quick questions. It seems just do the size estimate, just surprising that you guys can do a preannouncement. I am just wondering what the reasoning was for not doing a pre announce this time as you served down on in the past with sort of these ramp up issues and then I have a couple of follow up questions.

**Gareeb**: Sure, basically when we had the Merano issue, we thought that pretty comfortable that we could offset that with the strength of the silane […] the poly production Pasadena as you can see from the charts through the month of May and early June. They are really up for the fire in Pasadena. We felt okay may be we won't be at the top end of the range, but we should be in the range. And basically we ended about 2% outside the range, which is about a couple of days' worth of production. And so we didn't take that as a pre announcement in terms of doing it earlier in this quarter if you will, primarily because we didn't think 2% outside the bottom end of the range was material if you will. But also we wanted to provide a second half up date that we would not have been ready to provide. And we also wanted to have the demonstrated recovery both from the fire as well as the replacement of the equipment in Merano to ensure that we had a pretty solid set of numbers in our head for Q3 and for the second half of the year.

In a report dated July 23, 2008, a Deutsche Bank analyst expressed surprise at the Company's disclosure: "This is the third miss in four quarter . . . we were surprised the company did not pre-announce these results."

On July 24, 2008, an analyst from Credit Suisse stated in relevant part: "This was the first instance company had to deliver on a complex factory build – and for the third time company slipped on execution. Company did not preannounce [] either compounding issues – making it "Strike 3" for several investors we spoke with . . ."

The July 23, 2008 disclosure caused the price of the Company's stock to drop from $53.80 to $42.23 in unusually heavy trading.

As ERISA fiduciaries, Defendants were required to manage the Plan's investments, including the investment in MEMC Stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries. This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur. Conflicts of interest arise when a company that invests plan assets in company stock flounders. As the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.

MEMC's SEC filings, including proxy statements, during the Class Period make clear that a significant percentage of the Company's officers and directors' compensation is stock-based.  For example, the following stock awards, fees and options allocated to Director Defendants: (I) Defendant Blackmore, $363,051; (ii) Defendant Boehlke, $207,239; (iii) Defendant Marren, $219,239; (iv) Defendant Marsh, $196,239; (v) Defendant McNamara, $158,603; (vi) Defendant Stevens, $368,937; (vii) Defendant Turner, $232,471; and (viii) Defendant Williams, $194,239.  Defendant Gareeb also received option awards for 2008 and 2007 in the amount of $4,831,721 and $12,455,747, respectively.  Further, Defendant Gareeb's 2008 short term incentive award was determined as follows. For 2008, as part of his Employment Agreement, the Compensation Committee established a target bonus level of 100% of Defendant Gareeb's annual base salary and a maximum bonus level of 200% of his annual base salary.  Defendant Gareeb's target award was based on the Company's overall financial performance (including operating income and earnings per share), and the Company's achievement of certain strategic initiatives and objectives (including executive team development, certain capacity expansion and product launches, solar business development, key account penetration and market share, customer satisfaction and research and development). Under the heading "Long Term

- 40 -

Incentive Awards (Equity Awards)," the 2008 Form 14A provides that executive compensation is based in part on the Company's earnings.  Certain Defendants' compensation was directly tied to the performance of the Company and the price of MEMC's Stock. Accordingly, certain Defendants were motivated to inflate the perceived success of the Company and boost its apparent performance, because the better the Company's performance and, consequently, the higher the price of the Company's Stock, the larger certain Defendants' salaries and incentive compensation.

Some Defendants may have had no choice in tying their compensation to MEMC Stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan's participants' and beneficiaries' retirement savings invested in MEMC Stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

Any signal to the market that the Company was not a sound, long term investment, such as the Plan's divestiture of MEMC Stock, would have called into question Defendants' job performance as corporate officers. Rather than have anyone question their soundness as leaders of MEMC, Defendants chose to remain silent and let the Plan continue to hold and acquire MEMC Stock.

These conflicts of interest put Defendants in the position of having to choose between their own interests as directors, executives, and stockholders, and the interests of the Plan's participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."   Defendants did nothing to protect the Plan and the Plan's participants from the inevitable losses the Plan would suffer.

While the above Defendants protected themselves, they stood idly by as the Plan lost millions of dollars because of its investment in MEMC Stock.

Count I alleges fiduciary breach against the following Defendants: the Company, the Director Defendants, and the Investment Committee Defendants (collectively, the "Prudence Defendants").

Count II alleges fiduciary breach against the following Defendants: the Company and the Director Defendants (collectively, the "Monitoring Defendants").

Count III alleges that Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities and otherwise placing their own and/or the Company's interests above the interests of the participants with

respect to the Plan's investment in MEMC Stock.

Count IV alleges co-fiduciary liability against all Defendants.  Plaintiff claims that ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no effort to remedy those breaches. In particular, they did not communicate their knowledge of the Company's improper activity to the other fiduciaries.

The Amended Complaint alleges that MEMC, through its officers and employees, was unable to meet its business goals, withheld material information from the market, and profited from such practices. Thus, according to Plaintiff, knowledge of such practices is imputed to MEMC as a matter of law. Because Defendants knew or should have known of the Company's failures and inappropriate business practices, they also knew that Defendants were breaching their duties by continuing to maintain Plan investments in Company stock. Yet they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of MEMC's failed and inappropriate business practices and by obfuscating the risk that these practices

posed to the Company, and, thus, to the Plan.

It is further alleged that MEMC knowingly participated in the fiduciary breaches of Defendants who failed to prudently and loyally manage the Plan in that it benefitted from the sale or contribution of its stock at prices that were disproportionate to the risks for Plan participants. Likewise, the Monitoring Defendants knowingly participated in the breaches of Defendants who failed to loyally and prudently manage the Plan because, as alleged above, they had actual knowledge of the facts that rendered MEMC Stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted these Defendants to breach their duties.

The Monitoring Defendants' failure to monitor the Investment Committee Defendants enabled that committee to breach its duties.  As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost millions of dollars of retirement savings.

The Plan suffered millions of dollars in principal losses because Defendants imprudently invested the Plan's assets in MEMC Stock during the Class Period, in breach of  Defendants' fiduciary duties.

Plaintiff claims Defendants are liable for the Plan's losses in this case

because the Plan's investment in MEMC Stock was the result of Defendants'
decision to imprudently maintain the assets of the Plan in MEMC Stock.  Had
Defendants properly discharged their fiduciary and co-fiduciary duties, including
the monitoring and removal of fiduciaries who failed to satisfy their ERISA-
mandated duties of prudence and loyalty, eliminating MEMC Stock as an
investment alternative when it became imprudent, and divesting the Plan of
MEMC Stock when maintaining such an investment became imprudent, the Plan
would have avoided some or all of the losses that it, and indirectly, the participants
suffered.

## Discussion

ERISA is a comprehensive remedial statute designed to "protect ... the
interests of participants in employee benefit plans and their beneficiaries, ... by
establishing standards of conduct, responsibility, and obligation for fiduciaries of
employee benefit plans, and by providing for appropriate remedies, sanctions, and
ready access to the Federal courts." 29 U.S.C. § 1001(b). Specifically, ERISA
provides, in pertinent part:

> (a)(1) Subject to sections 403(c) and (d), 4042, and 4044 [29 U.S.C.
> §§ 1103(c), (d), 1342, 1344], a fiduciary shall discharge his duties
> with respect to a plan solely in the interest of the participants and
> beneficiaries and—
>
> (A) for the exclusive purpose of:

(I) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

(2) In the case of an eligible individual account plan (as defined in section 407(d)(3) [29 U.S.C. § 1107(d)(3) ], the diversification requirement of paragraph 1(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph 1(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 407(d)(4) and (5) [29 U.S.C. § 1107(d)(4) and (5) ] ).

29 U.S.C. § 1104(a).[3] These requirements generally are referred to as the duties of loyalty and care, or as the "solely in the interest" and "prudence" requirements.

_____

[3]  ERISA defines an eligible individual account plan as follows:
an individual account plan which is (i) a profit-sharing, stock bonus, thrift, or savings plan; (ii) an employee stock ownership plan; or (iii) a money purchase plan which was in existence on the date of enactment of this Act and which on such date invested primarily in qualifying employer securities.  29 U.S.C. § 1107(d)(3)(A).

**The Plan**

The Plan is an "individual account plan," or "defined contribution plan," see ERISA § 3(34).   The Plan provides for acquisition and holding of employer securities, such that it is an "eligible individual account plan" (EIAP) under Section 407(d)(3) of ERISA.    The Plan includes a "Qualified cash or deferred arrangement," making it a 401(k) plan.  Contributions for a Plan participant come from Participant elective contributions, MEMC matching contributions and MEMC non-matching contributions.

Participants self direct their investments among a variety of investment options offered under the plan, including MEMC stock.  Participants may direct the investment of the Individual Account Assets among the Plan investment funds as they choose.

The Summary Plan Description, (SPD) which is provided to all participants under ERISA specifically notifies participants that "[t]he funds available provide varying degrees of risk and potential return...[b]y choosing a mix of funds, you can reduce risk and help to protect your return."  The SPD describes the MEMC Stock Fund as a Single Common Stock Fund which is composed solely of shares of MEMC common stock for those  investors who want to share in the potential growth of MEMC.  Significantly, the MEMC Stock Fund is included among the

Growth options which are described as the most volatile from day to day, and as having a strong potential for providing growth, with an added degree of risk. Moreover, participants are warned that investments in individual stocks are not diversified, therefore an investment in the  MEMC Stock Fund may expose the participants to a greater investment risk because the returns are dependent on the performance of a single company.

Plaintiff seeks to recover substantial losses to the Plan for which he claims Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S .C. §§ 1109 and 1132. Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in Company Stock during the Class Period, and because ERISA specifically authorizes participants, such as Plaintiff, to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this action as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## Standard  For Dismissal

Regarding the standard for determining whether to dismiss a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the United States Supreme Court has held:

> To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to state a claim to relief that is

> plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). Further, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id*. at 679 (internal quotations and citations omitted). Additionally, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id*. at 678 (internal quotations and citations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id,* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, "although a complaint need not include detailed factual allegations, 'a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 629-30 (8th Cir.2010)

(quoting *Twombly*, 550 U.S. at 555).

On a motion to dismiss pursuant to Rule 12(b)(6), "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated in the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)

**Prudence Claim (Count I)**

Defendants contend that plaintiffs fail to state a claim for breach of the duty of prudence. Specifically, defendants assert that a presumption of prudence attaches to the offering of employer stock where, as here, the plan is expressly designed to offer employer stock as an investment option. Defendants further assert that under this presumption, plan fiduciaries are only required to divest an EIAP of employer stock where the fiduciaries know or should know that the employer is in a "dire situation," such that the employer's viability as a going concern was threatened or its stock was in danger of becoming essentially worthless. Defendants contend that Plaintiff does not, and cannot, plead facts demonstrating that MEMC is, or ever was, in such a "dire situation" sufficient to overcome the presumption of prudence.

Plaintiff, on the other hand, contend that Count I states a claim for breach of

the duty to prudently manage the Plan's assets. Specifically, Plaintiffs assert that

the presumption of prudence does not apply to this Plan because *Moench* was

decided in the context of an ESOP, not an EIAP type plan.  Plaintiff further asserts

that the presumption of prudence does not apply at the pleading stage. Plaintiff

argues that even if the presumption of prudence does apply, plaintiff need not

plead impending collapse to overcome the presumption, and he has pled sufficient

facts to overcome the presumption.

**"Presumption of prudence"**

In *Moench*, the Third Circuit Court of Appeals held that "an [Employment

Stock Ownership Program], ESOP fiduciary who invests the assets in employer

stock is entitled to a presumption that it acted consistently with ERISA by virtue

of that decision."  62 F.3d at 571.  In *Edgar v. Avaya, Inc.*, 503 F.3d 340 (3d Cir.

2007), the Court extended the *Moench* presumption to all eligible individual

account plans, EIAPs. 503 F.3d at 347.  Likewise, the Fifth Circuit has also held

that the *Moench* presumption applies to any allegations of fiduciary duty breach

for failure to divest all types of EIAPs.  *Kirschbaum v. Reliant Energy, Inc.*, 526

F.3d 243, 254 (5th Cir. 2008).

Moreover, the majority of courts considering the *Moench* presumption have

concluded that overcoming the presumption requires allegations which entail

substantially more than merely challenging the prudence and loyalty exhibited by Defendants, as stated by this Court's Order.  See, *e.g.*, *Wright v. Medronic, Inc.*, 2010 WL 1027808, *5 (D. Minn.2010)("plaintiffs must allege sufficient facts to demonstrate that they have a non-speculative claim that investing in [the Defendant company] stock during the class period was so risky that no prudent fiduciary would have invested *any* Plan assets in" the stock.(emphasis in original); *In re Bank of America*, 2010 WL 3448197 * 20 ("The pleading must allege that the fiduciary had knowledge at a pertinent time of 'an imminent corporate collapse or other "dire situation" sufficient to compel an ESOP sell-off,'" quoting, *In re Lehman Bros*, 683 F.Supp.2d at 301; *Crocker v. KV Pharm. Co*, 2010 WL 1257671, * 20 (E.D. Mo. 2010)("[T]o meet this standard on the pleadings, the facts alleged must depict the kind of 'dire situation' at the subject company which would require plan fiduciaries to disobey plan terms to invest in company stock so that they might satisfy their prudent investment obligation to plan participants under ERISA. Facts that could indicate that plan fiduciaries abused their discretion by continuing to invest in company stock include, as was the case in *Moench*, a 'precipitous decline in the price of [the employer's] stock,' together with allegations that plan fiduciaries knew of the stock's 'impending collapse' and the conflicted status of the fiduciaries," quoting, *In re Merck & Co, Inc. Sec., Deriv. &*

*ERISA Litig,* 2009 WL 790452, *3 (D.N.J.  2009) (internal citations omitted).

Recognizing the competing goals of ERISA and ESOPs,[4] and attempting to balance these goals in relation to claims that an ESOP fiduciary violated its ERISA duties by continuing to invest in employer securities, the Third Circuit, in *Moench v. Robertson*, 62 F.3d 553 (3rd Cir.1995), developed the "presumption of prudence." Specifically, the Third Circuit found:

> In a case such as this, in which the fiduciary is not absolutely required to invest in employer securities but is more than simply permitted to make such investments, while the fiduciary presumptively is required to invest in employer securities, there may come a time when such investments no longer serve the purpose of the trust, or the settlor's intent. Therefore, fiduciaries should not be immune from judicial inquiry, as a directed trustee essentially is, but also should not be subject to the strict scrutiny that would be exercised over a trustee only authorized to make a particular investment. Thus, a court should not undertake a de novo review of the fiduciary's actions.... Rather, the most logical result is that the fiduciary's decision to continue investing in employer securities should be reviewed for an abuse of discretion.
>
> ... we hold that in the first instance, an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However,

---

[4]  "ESOPs, unlike pension plans, are not intended to guarantee retirement benefits, and indeed, by its very nature an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan." *Moench*, 62 F.3d at 568 (internal quotations and citation omitted). "Under their original rationale, ESOPs were described as ... device[s] for expanding the national capital base among employees—an effective merger of the roles of capitalist and worker." Id. (internal quotations and citation omitted).

the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities.

In attempting to rebut the presumption, the plaintiff may introduce evidence that "owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust." Restatement (Second) § 227 comment g. As in all trust cases, in reviewing the fiduciary's actions, the court must be governed by the intent behind the trust—in other words, the plaintiff must show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate. In determining whether the plaintiff has overcome the presumption, the courts must recognize that if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive.

In considering whether the presumption that an ESOP fiduciary who has invested in employer securities has acted consistently with ERISA has been rebutted, courts should be cognizant that as the financial state of the company deteriorates, ESOP fiduciaries who double as directors of the corporation often begin to serve two masters. And the more uncertain the loyalties of the fiduciary, the less discretion it has to act.

*Moench*, 62 F.3d at 571–72 (internal citation omitted).

The Second, Fifth, Sixth, Seventh, Ninth and Eleventh Circuits have all expressly adopted the *Moench* "presumption of prudence," and no federal appellate court has rejected the presumption on its merits. See *White v. Marshall & Ilsley Corp.*, 714 F.3d 980 (7th Cir.2013); *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267 (11th Cir.2012); *In re Citigroup ERISA Litig.* ., 662 F.3d 128 (2d Cir.2011);

*Quan v. Computer Sciences Corp.*, 623 F.3d 870 (9th Cir.2010); *Kirschbaum v. Reliant Energy, Inc*., 526 F.3d 243 (5th Cir.2008); *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir.1995). However, while the circuit courts have adopted the "presumption of prudence," the framework of the presumption does vary to some extent among the circuits.

Circuit Courts throughout the country have applied the *Moench* presumption of prudence to EIAPs.   *See, e.g., Kirschbaum,* 526 F.3d at 254; *Edgar v. Avaya*, 503 F.3d 340, 345-48 (3d Cir. 2007); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1098 (9th Cir. 2005).

When adopting the *Moench* presumption, the Ninth Circuit agreed with the Third Circuit and added "that if there is room for reasonable fiduciaries to disagree as to whether they are bound to divest from company stock, the abuse of discretion standard protects a fiduciary's choice not to divest. This will allow fiduciaries to fulfill their duties in the safe harbor that Congress seems to have intended to provide them for managing EIAPs and ESOPs." *Quan*, 623 F.3d at 882 (internal quotations and citation omitted). The Ninth Circuit further held:

> To overcome the presumption of prudent investment, plaintiffs must therefore make allegations that clearly implicate the company's viability as an ongoing concern or show a precipitous decline in the employer's stock ... combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement.

*Id.* (internal quotations and citations omitted).

In *In re Citigroup*, the Second Circuit adopted the *Moench* "presumption of prudence" and endorsed the "guiding principle" recognized by the Ninth Circuit that "judicial scrutiny should increase with the degree of discretion a plan gives its fiduciaries to invest," finding that "a fiduciary's failure to divest from company stock is less likely to constitute an abuse of discretion if the plan's terms require—rather than merely permit—investment in company stock." *In re Citigroup*, 662 F.3d at 138. The Second Circuit then set forth its formulation of the presumption as follows:

> We agree with [the *Moench* court's] formulation and cannot imagine that an ESOP or EIAP settlor, mindful of the long-term horizon of retirement savings, would intend that fiduciaries divest from employer stock at the sign of any impending price decline. Rather, we believe that only circumstances placing the employer in a "dire situation" that was objectively unforeseeable by the settlor could require fiduciaries to override plan terms. The presumption is to serve as a "substantial shield," that should protect fiduciaries from liability where there is room for reasonable fiduciaries to disagree as to whether they are bound to divest from company stock. The test of prudence is ... one of conduct rather than results, and the abuse of discretion standard ensures that a fiduciary's conduct cannot be second-guessed so long as it is reasonable.

Although proof of the employer's impending collapse may not be required to establish liability, [m]ere stock fluctuations, even those that trend downhill significantly, are insufficient to establish the requisite imprudence to rebut the *Moench* presumption. We judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight. We cannot rely, after the fact, on the magnitude of the

decrease in the employer's stock price; rather, we must consider the extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed.

*Id*. at 140 (internal quotations and citations omitted).

On the other hand, in *Kirschbaum*, the Fifth Circuit did not hold that the "presumption of prudence" could be overcome only in the case of investments in stock of a company that is about to collapse. See *Kirschbaum*, 526 F.3d at 256.

The Fifth Circuit held:

[t]he presumption, however, is a substantial shield. As Moench states, it may only be rebutted if unforeseen circumstances would defeat or substantially impair the accomplishment of the trust's purposes. One cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from ESOP or EIAP plan provisions. Instead, there ought to be persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest. Less than rigorous application of the Moench presumption threatens its essential purpose. A fiduciary cannot be placed in the untenable position of having to predict the future of the company stock's performance. In such a case, he could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded.

*Id*. (internal citation omitted).

Additionally, in *Lanfear*, the Eleventh Circuit rejects any interpretation of the presumption that provides that the only circumstance in which a fiduciary could abuse its discretion by following an ESOP plan's directions about company

stock was when the fiduciary knew that the company was peering over the precipice into a financial abyss. See *Lanfear*, 679 F.3d at 1280. Instead, the Eleventh Circuit sets forth the test as follows:

> Although a fiduciary is generally required to invest according to the terms of the plan, when circumstances arise such that continuing to do so would defeat or substantially impair the purpose of the plan, a prudent fiduciary should deviate from those terms to the extent necessary. Because the purpose of a plan is set by its settlors (those who created it), that is the same thing as saying that a fiduciary abuses his discretion by acting in compliance with the directions of the plan only when the fiduciary could not have reasonably believed that the settlors would have intended for him to do so under the circumstances. That is the test.

*Id*. at 1281.

The Eighth Circuit has not addressed whether it would adopt the *Moench* "presumption of prudence." Based upon the sound reasoning behind the *Moench* "presumption of prudence," the Court finds that the Eighth Circuit would adopt the *Moench* "presumption of prudence" in cases in which, under the terms of an ERISA plan such as this where the individual participants direct their contributions to the various plans and would apply an abuse of discretion standard of review to the fiduciary's decision to continue to offer employer securities. Further, the Court finds that the Eighth Circuit would require the plaintiff to show that the ERISA fiduciary could not have believed reasonably that continued

adherence to the EIAP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate in order to demonstrate an abuse of discretion. The Eighth Circuit would also require the plaintiff to present persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest.

**Applicability of presumption at motion to dismiss stage**

Plaintiff asserts that the "presumption of prudence" is not applicable at the pleading stage of an action. The Second, Third, Fifth, Seventh, and Eleventh Circuits have applied the presumption when considering motions to dismiss; the Sixth Circuit has not.[5]

The "presumption" is not an evidentiary presumption; it is a standard of review applied to a decision made by an ERISA fiduciary. Where plaintiffs do not allege facts sufficient to establish that a plan fiduciary has abused his discretion, there is no reason to deny a motion to dismiss. *In re Citigroup*, 662 F.3d at 139. See also *Lanfear*, 679 F.3d at 1281 ("The *Moench* standard of review of fiduciary action is just that, a standard of review; it is not an evidentiary presumption. It

---

[5] The Court is cognizant that this issue is currently pending before the United States Supreme Court. See *Fifth Third Bancorp v. Dudenhoeffer*, No 12-751, *cert. granted* December 13, 2013. Consistent with the majority of courts construing the applicability of the presumption, the Court will apply it with respect to the pending Motion. In the event that the Supreme Court determines the presumption is inapplicable in the 12(b)(6) analysis, the Court will entertain a motion to reconsider.

applies at the motion to dismiss stage as well as thereafter."); *White*, 714 F.3d at

990–91 ("As to its application at the pleading stage, the presumption of prudence

is not an evidentiary standard but a substantive legal standard of liability and

conduct. Thus, we agree with the Second, Third, and Eleventh Circuits that a claim

against ESOP fiduciaries alleging a violation of the duty of prudence may be

dismissed at the pleading stage if the plaintiffs do not make allegations sufficient

to overcome the presumption of prudence.")

Having reviewed the decisions by the circuit courts that have addressed this

issue, the Court finds the reasoning of the Second, Third, Fifth, Seventh, and

Eleventh Circuits more persuasive, particularly in light of the requirement that the

plaintiff plead "enough facts to state a claim to relief that is plausible on its face,"

*Twombly*, 550 U.S. at 570. The Court, therefore, finds that the "presumption of

prudence" is appropriately applied at the motion to dismiss stage.

**Applicability of presumption to Plan**

As set forth in *Moench*, the "presumption of prudence" applies when "the

fiduciary is not absolutely required to invest in employer securities but is more

than simply permitted to make such investments." *Moench*, 62 F.3d at 571. In the

Plan before the Court, the fiduciaries are allowed to offer the MEMC Stock Fund

as an investment option in the Plan.  This role clearly falls within the protections

of the presumption.

> "One cannot say that whenever plan fiduciaries are aware of
> circumstances that may impair the value of company stock, they have
> a fiduciary duty to depart from ESOP or EIAP plan provisions.
> Instead, there ought to be persuasive and analytically rigorous facts
> demonstrating that reasonable fiduciaries would have considered
> themselves bound to divest.  Less than rigorous application of the
> *Moench* presumption threatens its essential purpose. A fiduciary
> cannot be placed in the untenable position of having to
> predict the future of the company's stock's performance. In such a
> case, he could be sued for not selling if he adhered to the plan, but
> also sued for deviating from the plan if the stock rebounded."

*Kirschbaum*, 526 F.3d at 256.   Accordingly, the Court finds that the "presumption

of prudence" is applicable to the Plan.

**Sufficiency of complaint**

In order for Plaintiff to sufficiently allege his prudence claim, he must set

forth sufficient facts, presumed to be true and construed in the light most favorable

to Plaintiff, showing that he plausibly can overcome the "presumption of

prudence."  As set forth above, Plaintiff must plead persuasive and analytically

rigorous facts demonstrating that reasonable fiduciaries would have considered

themselves bound to divest and discontinue offering MEMC stock as an

investment option.

Having carefully reviewed the Amended Complaint, the Court finds that

although Plaintiff has set forth numerous specific and detailed facts regarding

certain aspects of MEMC's financial well-being, and even presuming these facts to be true and construing them in the light most favorable to Plaintiff, Plaintiff has not shown that he plausibly can overcome the "presumption of prudence." Most damaging to Plaintiff's prudence claim is the fact that the price of Chesapeake stock during the Class Period always retained significant value. The Court finds that it is implausible that a reasonable fiduciary would have considered himself bound to divest when the price of the stock had not decreased so low as to be worth almost nothing. In fact, had the defendant fiduciaries stopped offering MEMC stock and divested the Plan of the stock, they would have risked liability for having failed to follow the terms of the Plan, particularly if the price of MEMC stock increased.

Accordingly, the Court finds that plaintiffs' prudence claim should be dismissed.

Plaintiff's claim that Defendants should have sold the stock and withdrawn the stock as an investment option does not support his loyalty claim.  Defendants made no investment recommendations.  The participants themselves directed which fund they wanted their investments in; they could also change the investments to other funds.

Plaintiff alleges that MEMC suffered operational disruptions which caused

the MEMC stock to decrease and caused MEMC to miss its earnings projections. As Defendants point out, the projections were missed by less than 2%. Plaintiff fails to set forth any facts which would notify a Plan fiduciary that this change in operations required them to withdraw the stock from being an investment option. Indeed, the Plan Summary explains to investors that there exists risks in any stock, including the MEMC stock. The fact that a company's stock price will or conceivably may experience a decline – even a substantial decline – is not enough to overcome the *Moench* presumption. *See, e.g., Wright*, 360 F.3d at 1099 ("Mere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the *Moench* presumption.")

**Failure to Disclose Material Non-Public Information**

Plaintiff's claim that Defendants should have disclosed non-public information fails because to do so, Defendants would have been in violation of other federal laws.  To impose such disclosure duties would directly alter, amend, and, supersede – indeed, violate – federal securities laws and contravene section 514(d) of ERISA. 29 U.S.C. § 1144(d) ("Nothing in [Title I of ERISA] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under any such law.") "Congress has made clear when ERISA conflicts with another provision of federal law,

ERISA must be subordinated." *In re CF&I Fabricators of Utah*, 150 F. 3d 1293, 1301 (10th Cir. 1998).Surely Plaintiff would not advocate such a wanton level of disregard for the law.

Had Defendants disclosed non-public information, Defendants would have violated federal securities law.  17 CAR 243.100.  Plan participants would have been in violation of the Securities Exchange Act. *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).

**Prior notifications**

Defendants are correct in arguing that the statements made by Defendants regarding business communications are not actionable under ERISA.  *Crowley ex rel. Corning, Inc, Inv. Plan v. Corning, Inc.,* 234 F. Supp. 2d 222, 228 (W.D.N.Y. 2002) (public statements and omissions concerning financial performance fail to state a claim under ERISA "regardless of [the] truth or falsity."); *In re Calpine Corp. ERISA Litig.*, No. C 03-1685**,** 2005 WL 3288469, at *9 (N.D. Cal. Dec. 5, 2005) (granting motion to dismiss ERISA disclosure claim where plaintiff could not establish statements were made in fiduciary capacity or were directed at plan participants);*Kirschbaum*, 526 F.3d at 257 (affirming summary judgment where, *inter alia*, plaintiff failed to show "defendants were acting in anything other than a corporate capacity in making these statements").  Plaintiff has failed

to set forth a link between the business communications and Defendants' fiduciary capacity actions.

**Failure to Adequately Monitor Other Fiduciaries Claim**

Because plaintiff's failure to adequately monitor other fiduciaries claim in Count II is derivative of their prudence and loyalty claims, and because the prudence and loyalty claims have been dismissed, the Court finds that plaintiff's failure to adequately monitor other fiduciaries claim must likewise be dismissed.

**Conflict of Interest**

Plaintiff contends that he has sufficiently allege a claim for avoiding conflict of interest by engaging independent fiduciaries to make independent judgments concerning the plan.  Plaintiff sets out Defendants' compensation and that they engaged in their own self-interest without regard to safe-guarding the interests of the Plan and its participants.

The Court finds that plaintiffs have not set forth sufficient factual allegations to state a claim. In his Amended Complaint, Plaintiff simply makes conclusory statements regarding Defendants' compensation with no factual allegations to support the statements or how they relate to any duty owed to Plaintiff.   Additionally, a conflict of interest claim can not be based solely on the fact that an ERISA fiduciary's compensation was linked to the company's stock.

See *In re Citigroup*, 662 F.3d at 146 ("We agree with the many courts that have refused to hold that a conflict of interest claim can be based solely on the fact that an ERISA fiduciary's compensation was linked to the company's stock.").

**Co-Fiduciary Liability**

Section 1105(a) of ERISA provides that a fiduciary shall be liable for a co-fiduciary's breach, only if he: (1) knowingly participated in the breach or knowingly undertook to conceal an action or omission, knowing that such act or omission was a breach; (2) enabled the breach by failing to comply with section 1104(a)(1), the prudent-man standard; or (3) had knowledge of the breach by the co-fiduciary and failed to take steps to remedy the breach. 29 U.S.C. § 1105(a).

Plaintiff must set forth facts that Defendants each had actual knowledge of a breach by another fiduciary and failed to take reasonable steps to remedy the breach. *Donovan v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983)(explaining that a "fiduciary must know the other person is a fiduciary with respect to the plan, and must know that he participated in the act that constituted a breach, and must know that it was a breach"). The Amended Complaint fails to set out sufficient facts to state a claim for Co-Fiduciary liability.

**Conclusion**

For the reasons set forth above, the Court now concludes that the Amended

Complaint fails to sufficiently set forth plausible causes of action against

Defendants under ERISA.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, [Doc.

No. 20], is **GRANTED**.

**IT IS FURTHER ORDERED** that this matter is **DISMISSED**.

Dated this 24th day of March, 2014.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE